The COLORADO DEPARTMENT OF SO-
CIAL SERVICES, Plaintiff-Appellee
and Cross-Appellant,

v.

The BOARD OF COUNTY COMMIS-
SIONERS Of the COUNTY OF PUEB-
LO, Defendant-Appellant and Cross-
Appellee,

and

Samuel J. Corsentino, Intervenor-Appel-
lant and Cross-Appellee.

No. 83SA316.

Supreme Court of Colorado,
En Banc.

March 11, 1985.

As Modified on Denial of Rehearing
April 1, 1985.

**4**

L. Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard Forman, Sol. Gen., Wade Livingston, Asst. Atty. Gen., Denver, for plaintiff-appellee and cross-appellant.

Terry A. Hart, James V. Phelps, Pueblo County Atty's. Office, Pueblo, for defendant-appellant and cross-appellee.

Ware & Marroney, Gerald A. Marroney, Pueblo, for intervenor-appellant and cross-appellee.

The Board of County Commissioners of the County of Otero and State of Colorado, Mitchell & Mitchell, P.C., Rexford L. Mitchell, Rocky Ford, and The Board of County Commissioners of El Paso County, Colo., Charles Berry, Colorado Springs, amicus curiae.

KIRSHBAUM, Justice.

This case presents questions concerning the respective responsibilities of the Colorado Department of Social Services (the Department), the General Assembly, and county governments to fund public assistance programs established by the Colorado Social Services Code, sections 26–1–101 to 26–15–113, 11 C.R.S. (1982 & 1984 Supp.) (the Code).[1] The case arose when the Department sought a judicial decree requiring the Board of County Commissioners of Pueblo County (the Board) to pay the Board's share of the county's total public assistance costs for 1981, pursuant to section 26–1–122 of the Code.[2] The Board asserted that its responsibility for funding public assistance programs was limited to the sums generated by a tax levy of 2.5 mills under section 26–1–125 of the Code and that the Department improperly calculated the amount of its mandatory funding requirements. The Board also filed a counterclaim seeking compensation from the Department. Samuel J. Corsentino, a resident and taxpayer of Pueblo County, intervened to challenge the constitutionality of the funding provisions of the Code.

After a trial to the court, the trial court concluded, *inter alia,* that (1) the funding

1. The Department, created by § 24–1–120, 10 C.R.S. (1982), is authorized to administer "programs relating to public assistance and welfare." § 26–1–102(1), 11 C.R.S. (1982). The Code at times implies that the term "social services" is an all encompassing generic term ("In providing for such programs relating to public assistance and welfare, the General Assembly finds that recipients of social services qualify ... for such services.... [T]he state department, not the several county governments, is the principal in all federal-state social services programs covered in this title...." § 26–1–102(2), 11 C.R.S. (1982)). However, the term "social services" is specifically defined as "services and payments for services ... available ... through the social services staff of the state and county departments for the benefit of eligible persons...." *Id.* § 26–2–103(11).

 The term "public assistance" is more broadly defined to include "assistance payments, food stamps, and social services provided to or on behalf of eligible recipients...." *Id.* § 26–2–103(7). Furthermore, the Department's administrative authority is defined as authority "to administer or supervise the administration of public assistance programs" and to "establish public assistance programs consisting of assistance payments and social services...." *Id.* § 26–2–104. Provisions describing the Department's authority to comply with applicable federal requirements, § 26–2–105, and describing procedures for initiating applications for public assistance, § 26–2–106, also suggest that the term "public assistance" is the more inclusive phrase. We will use the term "public assistance" to include all forms of payments and services authorized by the Code.

2. The complaint sought relief by injunction to prevent the Board "from reducing public assistance and welfare payments, and all other social services expenditures," and by writ of mandamus compelling the Board to "[a]ppropriate and expend such funds as are necessary to administer public assistance or welfare programs." It also sought a declaratory judgment that "Pueblo County must comply with C.R.S.1973, 26–1–122 and pay its share of public assistance and social services." Previous paragraphs of the complaint alleged that this duty was twenty percent of such costs.

scheme established by the Code is constitutional; (2) the Board's obligation to fund county public assistance costs is not limited by section 26–1–125 of the Code; (3) the Board is not entitled to reimbursement by the Department for sums the Board expended for foster care in 1981; (4) the Department properly determined the Department's share of welfare costs in 1981; and (5) the General Assembly is required to fund fully the county contingency fund established by section 26–1–126 of the Code.

The three parties have appealed one or more of these rulings, and the Board also appeals an evidentiary ruling of the trial court.[3] Several amici curiae have filed briefs in support of certain of the Board's contentions. We affirm the judgment of the trial court.

I

To aid the resolution of these issues, it will be helpful to briefly review the history of welfare programs in Colorado and to explain the functioning of the public assistance funding provisions established by the Code. The facts underlying the various claims will emerge in the course of these discussions.

A. *Overview of Public Assistance*

Prior to statehood, the territory's county governments were charged by various legislative provisions with the responsibility of providing relief to poor persons who either had no relatives in the territory or whose relatives could not or would not support them. *See* Ch. 68, C.R.S. (1868) (chapter entitled "Paupers"). These provisions continued in force upon the admission of Colorado into the Union. *See* Colo. Const. sched. § 1 (1876); ch. 76, Colo.Gen.Laws (1877). Indeed, substantially similar provisions remained in effect until 1981. *See* §§ 30–17–101 to –117, 12 C.R.S. (1977), *repealed and reenacted by* Ch. 367, §§ 30–17–101 to –206, 1981 Colo.Sess.Laws 1451. The reenacted provisions deleted all language requiring county responsibility for

public assistance programs, except for the obligation to provide burial services for indigent persons. *See* §§ 30–17–102, –104, 12 C.R.S. (1984 Supp.).

The state first assumed some responsibility for public assistance programs in response to the economic environment engendered by the Great Depression. In 1933, the General Assembly created a state relief committee and declared that providing "the necessaries of life" was a "State, County, City and Town purpose." Ch. 51, sec. 1, 1933 Colo.Sess.Laws 385 (codified at ch. 141, § 2, 4A Colo.Stat.Ann. (1949)). At an extraordinary session, the General Assembly reaffirmed that relief served both a state and county purpose and expressly provided that adoption of the new legislation did not relieve counties of their former duties under the "Paupers" statute. *See* Ch. 15, § 1, 1933–34, Colo.Sess.Laws 71 (2d Ex.Sess.) (codified at ch. 141, § 1, 4A Colo. Stat.Ann. (1949)).

In response to the passage by the federal congress of the Social Security Act in 1935, Pub.L. No. 74–271, 49 Stat. 620 (codified, as amended, at 42 U.S.C. § 301, *et seq.* (1982)), the General Assembly enacted the Welfare Organization Act of 1936. *See* ch. 5, 1936 Colo.Sess.Laws 27 (2d Ex.Sess.) (codified, as amended, at ch. 141, §§ 13 to 29, 4A Colo.Stat.Ann. (1949)). This act created state and county welfare departments and established a pattern of joint state and county funding responsibility together with general state control over public assistance programs, including federally assisted programs. *See id. See generally* Colorado Legislative Council, *Report to the Colorado General Assembly: Public Assistance Administration,* Research Pub. No. 135 (Nov. 1968).

The present version of the Code retains much of the structure first announced by its depression era predecessors. It establishes the duties of the state and county departments of social services;[4] grants au-

---

**3.** This court has accepted jurisdiction of this appeal pursuant to § 13–4–110, 6 C.R.S. (1973).

**4.** The Code expressly permits two or more counties to form joint district departments of social services. *See* § 26–1–115(2), 11 C.R.S. (1982).

thority to the executive director of the Department to issue rules governing the internal administration of both state and county departments; and authorizes the State Board of Social Services, a component body of the Department, to issue rules governing the scope and content of programs, the rights and responsibilities of persons affected by such programs, and the fiscal and personnel administration of the county departments. § 26–1–108(1), (2), 11 C.R.S. (1982). Furthermore, the State Board of Social Services, by rule, has authority to establish minimum personnel standards and qualifications, which rules govern the employment of support staff. *Id.* §§ 26–1–108(2), –119, –122; *Dempsey v. City & County of Denver*, 649 P.2d 726 (Colo.App. 1982). The Department's rules and regulations are binding on the several county departments. § 26–1–108(2), 11 C.R.S. (1982). *Colorado State Board of Social Services v. Billings*, 175 Colo. 380, 487 P.2d 1110 (1971).

Some decisions, however, remain within the authority of county departments, such as the choice of county director, whether certain specialized training shall be given to county department employees, and whether certain optional specialized programs should be adopted. §§ 26–1–117(1), –118(8), –122(4)(e), 11 C.R.S. (1982). It is clear, however, that the county social services departments are agents of the State Department. *Id.* § 26–1–118(1); *Board of County Commissioners v. State Board of Social Services*, 186 Colo. 435, 528 P.2d 244 (1974).

The federal government, the state and the counties contribute funds to public assistance programs in Colorado. Section 26–1–109(2)(a) authorizes the Department, with the written approval of the governor and the attorney general, to accept federal funds for public assistance programs under the terms and conditions of applicable federal statutes. To obtain federal aid for such programs as aid to the blind, families with dependent children (AFDC), the needy disabled and the elderly, the state program must operate in and be mandatory for all political subdivisions of the state. *See* 42 U.S.C. §§ 302(a)(1), 602(a)(1), 1202(a)(1) and 1352(a)(1) (1982). The federal share of financing for various public assistance programs ranges generally from fifty percent to ninety percent, depending on the nature of the expenditure and the type of the program. *See, e.g.,* 42 U.S.C. § 303(a)(1), (4)(B) (fifty percent of certain old age assistance expenditures); 42 U.S.C. § 603(a)(3)(B) (ninety percent of AFDC program costs). Other special federal assistance programs may be one hundred percent federally funded. *See, e.g.,* 42 U.S.C. § 8623(a)(1)(B) (1982) (Low-Income Home Energy Assistance (LEAP)).

The federal monies received by the state are held separately from state funds. The Code designates the state treasurer as ex officio custodian of these funds and authorizes the treasurer to disburse such funds for their designated purposes. *See* § 26–1–109(2)(b), (c), 11 C.R.S. (1982). These federal monies are included within the calculation of the state's share of public assistance costs, which is eighty percent of overall program and administrative costs. *Id.* § 26–1–122(3)(b), (4)(b).[5] The counties are also responsible for certain expenses of public assistance, not to exceed twenty percent. *Id.* § 26–1–122(1).[6]

The district department performs the same duties as county departments, with each county chargeable for the proportion of benefits expended in it. Each reference to "county" in this opinion applies equally to districts.

**5.** Whether all federally provided funds should be included in the calculation of this eighty percent is one issue in this case. There is no dispute that programs which are only partially federally funded should be included in the calculation. The Board contends, however, that programs such as LEAP which is funded 100% by the federal government or old age pension which is funded 100% by the state should be excluded from the calculation.

**6.** The eighty/twenty division is not unalterable. In certain exceptional circumstances, the State may assume a greater share of expenses. § 26–1–122(4)(d), 11 C.R.S. (1982). Counties which qualify for the monies from the state-funded county contingency fund, § 26–1–126, 11 C.R.S. (1982), will necessarily pay less than twenty percent. Also, county boards which do not comply with Department rules and regula-

The budget and appropriation processes for state and county public assistance program budgets are well established. The state fiscal year commences July 1 annually. § 24–30–204, 10 C.R.S. (1982). The Department begins work on its budget in the July preceding the next state fiscal year. The Department considers a variety of data in assessing state welfare needs, including actual expenses incurred in previous and current years and various indicators of general economic and social conditions. The budget contains separate funding requests for each program and fund. It must be submitted to the State Office of Planning and Budget by October 1, and, as modified there, is presented as part of the overall state budget to the General Assembly in December. Legislative committees hold hearings on the budget, which is eventually approved by the General Assembly prior to the commencement of the fiscal year. The General Assembly is required to make "adequate appropriations" for public assistance based upon the budget submitted by the Department. § 26–1–121(1)(a), 11 C.R.S. (1982). In the event the initial appropriation fails to meet the costs of public assistance programs, the General Assembly may supplement appropriations to redress the imbalance. *See* Colo. Const. art. V, § 32. Any unobligated and unexpended balances in state funds are credited to the general fund. *Id.* § 26–1–121(2).

Upon approval of its annual budget, usually near the July 1 date upon which the state fiscal year begins, the Department sends a "County Budget Letter" to each board of county commissioners. The letter includes projected fluctuations in caseloads, rate increases for programs and facilities, and provides estimates of the adequacy of the appropriations adopted by the General Assembly for the programs established by the Code. Because the counties employ a fiscal year based on the calendar year, *see* section 29–1–103(1), 12 C.R.S. (1984 Supp.),

and typically begin their budgeting process in the fall of each year, each county is aware of the Department's appropriated budget for the first six months of the county's next fiscal year and has some indication of the Department's budget priorities for the remainder of the county's next fiscal year well in advance of the commencement of the county budgetary process.

The public assistance budget prepared by each county in the fall must be submitted to the Department for review before it may be adopted by a board of county commissioners as part of the county's overall budget. § 26–1–124, 11 C.R.S. (1982).[7] The Department neither approves nor disapproves preliminary county budgets; it uses these budgets as an aid in monitoring the adequacy of present and future state budgets.

The Code requires the board of county commissioners of each county to include in the annual county tax levy sums sufficient to defray the total costs of that county's public assistance programs, up to a maximum of twenty percent of such costs. *Id.* § 26–1–122(1). The sums derived from the tax levy, together with the appropriate state and federal funds advanced to each county by the state treasurer upon warrants issued pursuant to vouchers from the Department, are deposited in a county social services fund in each county for payment of program and administrative costs. Sums are disbursed from that fund, upon proper warrants, by the director of the county program to appropriate programs and to eligible recipients. *See id.* §§ 26–1–109(2)(c), –122(4)(b).

Two particular aspects of the public assistance financing scheme bear special explanation—foster care funding under section 19–3–120, 8 C.R.S. (1984 Supp.), and the county contingency fund established by section 26–1–126, 11 C.R.S. (1982). The Children's Code requires the State Board of

---

tions may be denied state-disbursed funds for administrative expenses. *Id.* § 26–1–122(3)(b).

**7.** Although Department officials indicated that they have, on occasion, rejected items in a coun-

ty social services budget, they maintained that they neither approve nor disapprove the proposed county budgets, but use them as additional data for calculating the state budget.

Social Services to adopt a method for allocating funds for foster care. The Children's Code also provides that no county may exceed its particular allocation for foster care. § 19–3–120(1), 8 C.R.S. (1984 Supp.). Section 19–3–120(2)(d) and (e) provides that the Department shall reimburse a county department for eighty percent of the total county allocation as described in section 26–1–122. Thus, foster care is a fixed or capped program, where the total expenditures are limited, as compared to an entitlement program in which total costs depend primarily on the number of eligible recipients served.

Section 26–1–126 creates a "county contingency fund" funded by the General Assembly. The Department is required to make advancements from this fund to counties qualifying for such payments. A county is eligible for payments from this fund if a 3.0 mill levy would provide less than that county's actual required share of public assistance costs. Section 26–1–126(3) provides a method for calculating the amount to be advanced each month to qualifying counties. Because data concerning actual expenditures in each county does not arrive at the Department until approximately two months after funds for a particular month have been advanced, in practice the Department authorizes advancements from this fund based upon estimated claims. The Department later recoups from or reimburses to the counties the amounts of prior advancements that have exceeded or fallen short of the actual amount to which a particular county was entitled.

### B. *Pueblo County Public Assistance Expenses*

The events precipitating the public assistance deficit in Pueblo County's 1981 fiscal year budget began in 1979. In fiscal year 1979, Pueblo County imposed a public assistance levy of 5.3 mills. Funds from the property tax revenues generated by this levy, certain other taxes,[8] and reliance upon $13,271,115 from state sources, including approximately $740,000 from the county contingency fund, constituted the sources from which Pueblo County's $15,916,675 public assistance costs were to be funded. However, the General Assembly did not appropriate enough money for the county contingency fund to permit the Department to pay all counties the full amounts to which they were entitled according to the formula in section 26–1–126(3) of the Code. Thus, during its fiscal year 1979 Pueblo County received approximately $22,000 less in county contingency fund payments than had been expected.[9]

The Department's 1979 County Budget Letter predicted a controversial legislative session in 1980 because the rate of inflation at that time exceeded the permitted rate of growth in government spending. The letter anticipated increases in various public assistance program expenses at seven percent generally, but contained no prediction regarding the adequacy of funding for the county contingency fund. However, in the fiscal 1980–1981 budget the General Assembly again failed to appropriate sufficient sums to cover the total county contingency fund obligations due eligible counties under the section 26–1–126(3) formula. As a result, Pueblo County received $65,000 less from the county contingency fund than had been projected for the county's 1980 fiscal year.

The 1980 County Budget Letter sent to all counties by the Department predicted

---

**8.** The County utilized $197,073 from the specific ownership tax on motor vehicles levied in lieu of *ad valorem* taxes on such vehicles pursuant to §§ 42–3–101 to –134, 17 C.R.S. (1984). It also realized revenue from delinquent property taxes and penalties and interest thereon. For purposes of providing a sufficient appropriation for public assistance costs and including such in the tax levy of each county, *see* § 26–1–122(1)(a), 11 C.R.S. (1982), all of these property-based taxes and revenues are properly relied on by the counties.

**9.** Pueblo County began its fiscal year 1979 with a public assistance surplus of over $290,000. As the combination of this, its property tax and state funds were inadequate to satisfy public assistance costs in that year, it ended county fiscal year 1979 with a public assistance deficit of $57,337.

that legislative funding for the county contingency fund in 1981 would be insufficient and counseled counties to "plan on receiving no more than 90% of claims against the contingency fund." The letter also predicted a net increase in program caseloads and warned that, because the General Assembly had previously rejected requests for supplemental appropriations to the county contingency fund, it was unlikely to approve such a request during the coming year. Pueblo County prepared its fiscal 1981 budget on the assumption that during 1981 it would recover 100% of the county contingency fund advancements to which it would be entitled under the formula established by section 26–1–126(3).

Pueblo County received a separate letter in 1980 from the Department concerning funding for the foster care program in 1981. This letter stated that "[n]o county will be reimbursed more than its allocation" for foster care and cautioned the county to budget carefully. The county, however, paid more than its total foster care allocation that year.

In 1980, anticipating a total expenditure of $23,300,000 for public assistance programs in its fiscal year 1981, as compared to expenses of $19,500,000 during fiscal year 1980, the Board sought permission, pursuant to section 26–1–125(3) of the Code, to increase its public assistance mill levy. The increase requested, 1.0 mill, was approved by the Division of Local Government, raising Pueblo County's public assistance levy to 6.3 mills. The County simultaneously received permission to increase its levy for other county services by .44 mill.[10] The county also imposed a wage and hiring freeze and laid off forty-one employees in other departments in an attempt to reduce overall expenses.

In March 1981, the Board received a letter from the Department stating that the appropriation for the county contingency fund was less adequate than previously anticipated. The letter announced that advancements from the fund in March would be reduced to seventy-five percent of the amount claimed and that no further sums would be available from the county contingency fund for the remainder of that state fiscal year. In fact, the appropriations for that fund were later determined to be adequate to meet only seventy-five percent of the total annual amounts due the counties under the formula established by section 26–1–126 of the Code. The shortage in anticipated county contingency fund advancements for Pueblo County was $235,845. By the end of county fiscal year 1981, Pueblo County's total public assistance deficit stood at approximately $539,000.

In May 1981, the Board determined that all available funds for public assistance programs in the county would be exhausted prior to the end of the year. It then notified the Department that "all Social Services operations" would be terminated in the county on November 1, 1981. When meetings among officials of the Department and the Board failed to resolve the funding dilemma, the Department, on August 18, 1981, ordered the Board "to continue to provide full assistance payments and ... social services" and filed this action seeking judicial enforcement of its directive.[11] The complaint also sought an order requiring the Board to expend such funds as might be necessary to administer public assistance programs in the county. The Board filed its answer and counterclaim, and Corsentino intervened to press his constitutional challenges to the Code.

## II

We first address intervenor Corsentino's constitutional challenges to the funding mechanism established by the Code. He

**10.** An overall increase of 1.44 mills in the levy of Pueblo County caused the county's budget to increase beyond the seven percent increase permitted by the Local Government Budget Law, § 29–1–301, 12 C.R.S. (1977 & 1984 Supp.). The law requires counties to obtain permission to exceed this growth ceiling.

**11.** The Department also advanced $800,000 to the county temporarily for public assistance program expenses.

contends that the funding provisions of the Code violate sections 3, 7 and 8 of article X of the Colorado Constitution, as well as the equal protection guarantees of the Colorado and federal constitutions. We reject his arguments.

### A. *State Revenue Provisions*

■ At the outset, it must be noted that statutes are presumed to be constitutional and that a party asserting the contrary must establish the constitutional infirmity alleged beyond a reasonable doubt. *E.g., Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984); *People v. Schwartz*, 678 P.2d 1000 (Colo.1984). Corsentino, therefore, bears the heavy burden of demonstrating that the funding provisions of the Code violate one or more of these constitutional provisions.

At the time this case arose, sections 3, 7 and 8 of article X of the Colorado Constitution [12] contained the following pertinent language:

Section 3. All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax. . . .

**12.** Section 3 of article X was subsequently amended to read, in pertinent part:

Each property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax.

*See* House Con.Res. No. 1005, Sec. 3, 1982 Colo. Sess.Laws 690, 691.

**13.** Corsentino introduced an array of statistical data which demonstrated the disparate effect of social services funding on taxpayers in different counties. The trial court summarized this evidence as follows:

In the year 1981, the [social services] mill levy runs from a low of 0.15 mills in Hinsdale County to a high of 6.45 mills in the City and County of Denver. Pueblo's levy for the same year was 6.3 mills. The levy in Jefferson County at the same time was 1.98 mills. The owner of a $10,000.00 home in Denver would pay $64.50 to support Denver's welfare programs, the owner of a home of equal value in Pueblo County would pay $63.00 for the same purposes, the owner of such a home in Jefferson County would pay $19.80 and the owner

. . . .

Section 7. The general assembly shall not impose taxes for the purposes of any county, city, town or other municipal corporation, but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation.

Section 8. No county, city, town or other municipal corporation, the inhabitants thereof, nor the property therein, shall be released or discharged from their or its proportionate share of taxes to be levied for state purposes.

### 1. *Article X, Section 3*

Corsentino contends that the State of Colorado, not the Board, must be considered the entity actually imposing the taxes which fund public assistance programs. He further argues that because such taxes fall unevenly on different Colorado taxpayers based on their counties of residence, they violate the uniformity requirement of article X, section 3.

Corsentino has demonstrated that the taxes collected by counties to support public assistance programs do not fall uniformly on Colorado's citizens.[13] However, the

of the same home in Hinsdale County would pay a paltry $1.50.

The average county social services mill levy was 2.178. Dividing the county levy by the number of county inhabitants produced per capita statistics with similar disparities: from a high of $30.40 in City and County of Denver to a low of $2.71 in Hinsdale County. Statewide, per capita social services costs averaged $11.21; per capita costs in Pueblo County were $23.41.

Corsentino's evidence further disclosed great variances in the number of welfare recipients in a given county relative to county population. For example, 4.36% of the state's population live in Pueblo County, whereas 9.4% of the state welfare caseload is served there. In 1981, the differences ranged from Costilla County whose proportion of state welfare recipients was nearly six times its percentage of the state's population to Gilpin County whose population percentage exceeded its welfare proportion by twenty-one times. Although this variable did not necessarily affect social services levies—in both Costilla and Gilpin Counties the levy was 2.5 mills—generally taxpayers in counties whose proportion of welfare recipients exceeded its percent-

flaw in his argument is the assertion that, although the Board, not the State of Colorado, is the taxing authority levying the taxes about which Corsentino complains, the Board is merely a conduit for the state and is using the tax dollars collected under the provisions of the Code for state purposes only.

■ In assessing whether the Code's funding provisions violate section 3, we first note that section 3 applies only to *ad valorem* property taxes. *See, e.g., Public Utilities Commission v. Manley*, 99 Colo. 153, 60 P.2d 913 (1936). It requires the burden of such taxation to be uniform on the same class of property within the jurisdiction of the authority levying the tax. *Denver Urban Renewal Authority v. Byrne*, 618 P.2d 1374 (Colo.1980). Corsentino does not contend that the *ad valorem* property taxes levied by each county for public assistance programs fall unevenly on identical classes of property within the county.

In support of his argument that the state must be deemed the taxing authority under the Code, Corsentino relies on *Pueblo Junior College District v. Donner*, 154 Colo. 26, 387 P.2d 727 (1963). In *Donner*, we considered the constitutionality of House Bill No. 360, ch. 219, 1961 Colo.Sess.Laws 688, which required counties in which junior college students resided to pay a portion of the costs of maintaining these students at junior colleges in other counties. The statute required the board of county commissioners in each county to levy an *ad valorem* tax, computed on the basis of full-time-equivalent non-resident junior college students from the county, which revenues were transferred to a state fund and then distributed proportionally to the junior colleges the students attended. Ch. 219, secs. 8 to 13, 1961 Colo.Sess.Laws at 690–91. Taxpayers who resided in counties or parts of counties included in a junior college district, as well as taxpayers in counties whose levies exceeded certain limits, were exempted from these taxes. *See id.,* sec. 8 at 690. We held this method of taxation to be prohibited by both section 3 and section 6 of Article X of the Colorado Constitution.[14] In so doing, we declared:

> Here, the various boards of commissioners have no discretion as to the amount of the levy, the purpose for which the money is to be raised or the expenditure of the same. County commissioners' functions under the bill are purely administrative, doing exactly what the legislature says—fix a levy based on a formula provided by the state, collect the tax and turn it over to the state. The tax provided for is a state tax to raise revenue for state purposes. The commissioners, in making the levy, are performing a purely ministerial duty under direction of the state.

*Donner*, 154 Colo. at 30, 387 P.2d at 729–30.

■ There are critical differences between the Code and the legislation declared invalid in *Donner*. The junior college funding scheme required tax funds raised by some, though not all, counties to be placed in a state fund and then to be distributed to junior colleges located in other counties. In contrast, under the Code locally raised funds for public assistance programs remain within and are disbursed within the county where they are raised. Furthermore, unlike the legislation considered in *Donner*, the Code does not exempt counties or portions of counties from its general funding provisions. Finally, under the Code county boards retain some

---

age of population paid higher taxes than those in counties in the reverse circumstances.

As the trial court concluded, "there can be no question that the cost of providing social services benefits varies markedly from county to county."

**14.** At the time *Pueblo Junior College District v. Donner* was decided, section 6 of article X prescribed the method for taxing motor vehicles and trailers and declared generally that "All laws exempting from taxation, property other than that hereinbefore mentioned shall be void. . . ."

This section has been amended to extend to other vehicles and movable equipment and retains language similar to that quoted above. *See* Colo. Const. art. X, § 6 (current version in 1A C.R.S. (1982)).

discretion to expend some of the sums collected from the taxes imposed.

We conclude that the counties retain sufficient control over the funds raised by the levy to be deemed the taxing authorities for the imposition of *ad valorem* taxes to meet the county share of public assistance costs. The levies concededly fall uniformly upon the same class of property within each county; therefore, the funding scheme does not violate article X, section 3 of the constitution.

2. *Article X, Sections 7 and 8*

■ Article X, sections 7 and 8 of the Colorado Constitution prohibit the General Assembly from either imposing state taxes for purposes of any particular smaller government unit or relieving a local governmental unit or the persons therein from the obligation to pay proportionate shares of taxes imposed for state purposes. Sections 7 and 8 further the goal of insuring uniform state taxation policies and prohibit the state from undermining the financial integrity of local governments. *See Denver Urban Renewal Authority v. Byrne*, 618 P.2d 1374 (Colo.1980); *City Real Estate, Inc. v. Sullivan*, 116 Colo. 169, 180 P.2d 504 (1947); *Burton v. City and County of Denver*, 99 Colo. 207, 61 P.2d 856 (1936); *In re Hunter's Estate*, 97 Colo. 279, 49 P.2d 1009 (1935); *Walker v. Bedford*, 93 Colo. 400, 26 P.2d 1051 (1933). Corsentino asserts that these constitutional provisions prohibit the state from adopting a tax-based funding program that serves both state and county purposes. We disagree.

In *Walker*, this court concluded that a statute imposing registration fees on motor vehicles violated the prohibition of state taxation for county purposes contained in Article X, Section 7 of the Colorado Constitution. Under that act, the fees were to be collected by state agents, transferred to the county treasurer of each county, and expended by the county commissioners of that county for work and direct relief to the unemployed. *See* Ch. 14, secs. 3 to 5, 1933 Colo.Sess.Laws (Ex.Sess.) 94, 95–97. Although the act declared that its purpose was "to allay the present widespread discontent and social unrest, to defend the State, [and] to relieve the needy and destitute citizens of this State from want and deprivation," *id.* sec. 1 at 94–95, this court concluded that the goal of aiding the needy and destitute was essentially a county purpose. We concluded, therefore, that the act violated section 7 because it was "an attempt by the General Assembly to impose a tax for county purposes." 93 Colo. at 407, 26 P.2d at 1053.

Two years after the *Walker* decision, in *In re Hunter's Estate*, another depression-era relief measure was challenged on similar constitutional grounds. In that case, executors of an estate challenged a ten percent additional inheritance tax to be used "for the payment of old age pensions and the assistance of aged, indigent persons." Ch. 145, 1933 Colo.Sess.Laws 764. This court concluded that the act there challenged carried out a state purpose, in that the old age pension statute levied a statewide tax for the benefit of state citizens wherever located, according to proportionate needs. *Walker* was distinguished on the ground that the statute there challenged served only a county purpose. We noted the test for "county purposes" to be as follows: "Is it for strictly county uses, for which the county or its inhabitants alone would benefit, or is it for a purpose in which the entire state is concerned or will benefit?" *In re Hunter's Estate*, 97 Colo. at 284, 49 P.2d at 1011. *See also Public Utilities Commission v. Manley*, 99 Colo. 153, 60 P.2d 913 (1936) (upholding apportionment of state use tax to the counties for maintenance of state highways because state highway system is of general concern to all inhabitants of the state).

■ In this case, we conclude that the Code serves both state and local purposes. It is true that the present provisions of the Code establish a strong legislative policy of state control over most aspects of the delivery of public assistance programs in the state. *Dempsey v. City & County of Denver*, 649 P.2d 726 (Colo.App.1982); *Evert v. Ouren*, 37 Colo.App. 402, 549 P.2d 791 (1976). However, the fact that a particular

statutory scheme evidences an overwhelming state interest or establishes primary state authority over most aspects of a comprehensive funding scheme does not resolve the issue of whether the legislation serves state, local or mixed purposes. As we indicated in *In re Hunter's Estate*, such questions as to what uses are the funds put and which governmental units benefit from those uses must also be asked when considering asserted constitutional prohibitions on the taxing authority of the state. When, as here, the effects of state-wide programs directly benefit residents of specific localities, we must conclude that such programs serve the "purposes" of the local governmental units which receive those services as well as cognizable interests of the state. *See Bonnet v. State*, 155 N.J. Super. 520, 382 A.2d 1175 (App.Div.1978), *aff'd*, 78 N.J. 325, 395 A.2d 194 (1978) (mem. op.).

■ Section 26-1-111(1), 11 C.R.S. (1982), declares that the public assistance and welfare activities of the state are "state as well as county purposes." While such legislative declaration is not controlling, it suggests that even though state control of public assistance programs is essential, the programs themselves fulfill county as well as state purposes. The suggestion that localities benefit when the indigent or disabled residents of their communities receive assistance for basic subsistence needs is compelling. *See State ex rel. Public Welfare Commission v. County Court*, 185 Or. 392, 203 P.2d 305 (1949).

The General Assembly has further recognized that county purposes are served by the Code by placing some, if minimal, budgetary authority to establish the total proposed public assistance expenditures in each county in the county boards. The ability of the state to cooperate with counties in programs serving the purposes of both the state and the counties is recognized by Section 18 of Article XIV of our constitution, which provides in pertinent part:

> Nothing in this constitution shall be construed to prohibit the state or any of its political subdivisions from cooperating or contracting with one another ... to provide any function, service, or facility lawfully authorized to each of the cooperating or contracting units, including the sharing of costs, the imposition of taxes, or the incurring of debt.

Colo. Const. art. XIV, § 18(2)(a).

■ For the above reasons, we conclude that the funding provisions of the Code do not violate Section 7 of Article X of the Colorado Constitution. The same considerations lead us to reject Corsentino's argument that these provisions violate Section 8 of Article X.

## B. *Equal Protection*

Corsentino also asserts that the Code violates federal and state constitutional guarantees of equal protection of the law. The federal constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Although the Colorado Constitution does not contain an identical provision, it has long been recognized that article II, section 25 of our state constitution provides a similar guarantee. *Lujan v. Colorado State Board of Education*, 649 P.2d 1005 (Colo. 1982); *Heninger v. Charnes*, 200 Colo. 194, 613 P.2d 884 (1980); *People v. Max*, 70 Colo. 100, 198 P. 150 (1921).

■ Different levels of scrutiny are applied to state legislation subjected to equal protection challenges. The type of classification and the nature of the right affected determine which level applies. *See Austin v. Litvak*, 682 P.2d 41 (Colo. 1984). *See generally* J. Nowak, R. Rotunda & J. Young, *Constitutional Law*, ch. 16 § I(c) (2d ed. 1983) [hereinafter J. Nowak]. State action which abridges fundamental rights or which employs racial or other suspect classifications is subjected to strict scrutiny. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Lujan*, 649 P.2d 1005 (Colo.1982). When the classification involves neither a suspect class, nor a fundamental right, review is

limited to a determination of whether the challenged legislative scheme is rationally related to a legitimate state interest. *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam).

Corsentino urges that the right to uniform taxation is a fundamental right and that the unequal social services tax burdens borne by similarly situated taxpayers cannot be justified by any compelling state interest. Alternatively, he submits that these disparate tax burdens bear no rational relation to any legitimate state interest. His arguments are unpersuasive.

In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Supreme Court held that rights not afforded explicit or implicit protection under the federal constitution are not fundamental for the purposes of that constitution. The *Rodriguez* Court concluded that the right to a public education was not such a fundamental right. In assessing whether education is a fundamental right under Colorado's constitution in *Lujan,* we rejected the *Rodriguez* test and held that whether rights are fundamental does not necessarily depend on whether they are guaranteed explicitly or implicitly by our state constitution, but whether they "have been recognized as having a value essential to individual liberty in our society." *Lujan,* 649 P.2d at 1015 n. 7. We reached this conclusion because the Colorado Constitution, unlike its federal counterpart, does not restrict itself to addressing only those areas deemed fundamental, but contains sections regulating health, safety and economic endeavors as well. *See id.; Alexander v. People ex rel. Schoolfield,* 7 Colo. 155, 2 P. 894 (1883).

■ No federal constitutional provision has been suggested by Corsentino as support for his suggestion that the right to uniform state taxation is a fundamental federal right. Nor has he demonstrated that such a right, as important as it is, has been recognized as essential to individual liberty. To the contrary, prior decisions of this court have recognized that the General

Assembly has broad discretion to structure taxes and that classifications of persons or property for purposes of taxation need be merely rational and related to a legitimate governmental purpose to survive equal protection challenges. *See, e.g., Gates Rubber Co. v. South Suburban Metropolitan Recreation and Park District,* 183 Colo. 222, 516 P.2d 436 (1973) (as modified); *District 50 Metropolitan Recreation District v. Burnside,* 167 Colo. 425, 448 P.2d 788 (1968); *Pueblo Junior College District v. Donner,* 154 Colo. 26, 387 P.2d 727 (1963). *See also,* J. Nowak, *supra,* ch. 11, § III. We conclude that such right is not fundamental, and therefore does not require application of the strict scrutiny standard.

We have noted that the Code serves both state and county purposes and that each county receives benefits from the public assistance programs established by the Code. It is both rational and logical to assign some of the costs of those programs to particular counties. As the Appellate Division of the New Jersey Superior Court observed in addressing challenges similar to those presented here asserted against New Jersey legislation establishing public assistance programs:

> It is rational that counties wherein welfare clients reside bear a share of the cost of benefits and administration thereof.... Providing the necessities of life of such people redounds to the benefit of the county locality in reducing crime, relieving health problems and promoting the general welfare of such localities in many other ways. The historical practice of requiring the expense of the poor to be met by municipalities further supports the rationality of the imposition. And, as argued by the State, since administration of some of these programs is delegated to county officials, the imposition of part of the cost on the counties may tend to promote efficiency in such administration.

*Bonnett v. State,* 155 N.J.Super. 520, 529, 382 A.2d 1175, 1180, *aff'd,* 78 N.J. 325, 395 A.2d 194 (1978) (citations omitted); *accord, Lindsay v. Wyman,* 372 F.Supp. 1360 (S.D.

N.Y.1974), *aff'd sub nom, Beame v. Lavine*, 419 U.S. 806, 95 S.Ct. 21, 42 L.Ed.2d 35 (1974) (mem. op.).

We also reject the assertion that the percentage of costs allocated to county governments is irrational. Any percentage allocation would be somewhat arbitrary. However, since all of the programs directly benefit county residents, an allocation of a twenty percent funding responsibility to the counties does not appear irrational. Furthermore, the allocation is the allocation of a maximum funding responsibility; the decision to temper the theoretical responsibilities of the county with the realities of county needs seems eminently sustainable. Corsentino has not met his burden of proving the statute unconstitutional beyond a reasonable doubt.

 Corsentino also argues that the particular method of financing selected by the General Assembly irrationally overburdens counties with low property wealth and thus aggravates the social problems addressed by the Code. While there is some strength to this argument (*see* footnote 13, *supra*), the Code does contain provisions for state assistance to counties not capable of generating sufficient funds from property taxes to pay their share of county public assistance costs. To this extent the General Assembly has somewhat alleviated the problem of which Corsentino complains—a problem inherent in the diverse geopolitical structure of this state. In challenging the constitutionality of a state statute on equal protection grounds, it is insufficient to establish that some effects of the legislation may be counterproductive to the stated aims of the legislation. Rather, one must demonstrate that no rational relation exists between the goals and effects of the statute. *See Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Lujan v. Colorado State Board of Education*, 649 P.2d 1005 (Colo.1982). As we have demonstrated, a rational relationship does exist between the requirement that local entities must support a portion of the costs of programs which serve the disadvantaged within their localities and the purposes of the Code. Thus, we conclude that the financing provisions of the Code do not deny county taxpayers equal protection of the laws under either the federal or the Colorado constitutions.

### III

The Board contends that the trial court erred in concluding that section 26–1–125, 11 C.R.S. (1982), does not limit Pueblo County's obligation for providing revenues to meet its funding obligations under the Code. Specifically, the Board asserts that the provisions of section 26–1–122, concededly requiring a level of county funding of public assistance programs not to exceed twenty percent, is modified and limited by section 26–1–125(1). We disagree with the Board's argument.

Section 26–1–122(1)(a), 11 C.R.S. (1982), provides:

The board of county commissioners in each county of this state shall annually appropriate as provided by law such funds as shall be necessary to defray the county department's twenty percent share of the overall cost of providing the assistance payments, food stamps (except the value of food stamp coupons), and social services activities delivered in the county, including the costs allocated to the administration of each, and shall include in the tax levy for such county the sums appropriated for that purpose. Such appropriation shall be based upon the county social services budget prepared by the county department pursuant to section 26–1–124, after taking into account state advancements provided for in this section.

As subsection (1)(d) of this section and the provisions of section 26–1–102(2) make clear, the twenty percent limitation is a maximum limitation on the county's share of the costs for social services provided under the Code.[15] However, the twenty

---

15. Section 26–1–102(2) provides in pertinent part:

percent limit is not the only constraint on county welfare funding established by the Code.

Section 26–1–125(1) contains the following pertinent provisions:

The board of county commissioners of each county shall make a county social services levy at such a rate that the amount when computed by applying the levy against the valuation for assessment of the county will provide the necessary money to be appropriated by the county, as provided by the final county social services budget as approved by the board of county commissioners, within the following limitations:

(a) Counties with valuation for assessment per capita of one thousand four hundred dollars or more, but less than one thousand six hundred dollars, not to exceed four mills;

(b) Counties with valuation for assessment per capita of one thousand six hundred dollars or more, but less than two thousand dollars, not to exceed three and one-half mills;

(c) Counties with valuation for assessment per capita of two thousand dollars or more, but less than two thousand six hundred dollars, not to exceed three mills;

(d) Counties with valuation for assessment per capita of two thousand six hundred dollars or more, not to exceed two and one-half mills.

Between 1976 and 1981, Pueblo County's per capita valuation for assessment exceeded $2,600, placing it within the 2.5 mill levy limit imposed by section 26–1–125(1)(d). However, the public assistance mill levy in Pueblo County exceeded this limitation in all of these years. In 1981, a mill levy of 6.3 was necessary to provide sufficient funds to pay the County's share of the costs of public assistance programs. A mill levy of 2.5 would have generated revenues for less than eight percent of the total program expenses that year.

■ At the outset, we observe that these sections, as part of the same Code and pertaining to the same subject, must be read *in pari materia*. *See Allen v. Charnes*, 674 P.2d 378 (Colo.1984). We must also consider the effects of other provisions concerning the public assistance funding duties of the state and the counties in construing the interrelationship of these two provisions.

Section 26–1–125(3) permits county boards to apply to the Division of Local Government in the Department of Local Affairs for authorization "to make a county social services levy at a reasonable rate in excess of the limits provided for in this section." Such language, expressly recognizing the ability of counties to impose levies in excess of the general formula of section 26–1–125, is strong evidence that the General Assembly did not consider that formula to constitute an absolute freeze on the obligation of counties to meet their county public assistance payment requirements.

The Department argues that the decision of this court in *Colorado State Board of Social Services v. Billings*, 175 Colo. 380, 487 P.2d 1110 (1971), resolves the question of the Board's funding obligations. We do not agree. The dispute in *Billings* arose when the state welfare authority brought an action to compel the county authorities in Weld County to defray twenty percent of the county's welfare costs. Weld County officials had estimated that twenty percent of its welfare costs would require a 5.51 mill levy, but levied just 3.0 mills. The precise issue was the construction to be given the separate funding provisions for aid to the blind, § 16–2–22, 2 C.R.S. (1963),

[T]he monetary limit prescribed in this article for the county department participation shall be deemed a precise limit beyond which no county can operate or be required to operate by virtue of any statutory or regulatory provision.

Section 26–1–122(1)(d) states:

Under no circumstances shall any county expend county funds in an amount to exceed its twenty percent share of actual costs for assistance payments, food stamps (except the value of food stamp coupons), and social services activities, including the administrative cost of each.

aid to indigent tuberculars, § 119–2–16, 6 C.R.S. (1963), aid to the needy disabled, *id.* § 119–6–21, and aid to dependent children, § 119–9–12, 10 C.R.S. (1967 Perm.Cum. Supp.). The county conceded its liability for twenty percent of the costs for the first three programs, but claimed it had no such obligation for the Aid to Dependent Children program. This court addressed the issue as one of statutory construction of the use of the word "may" rather than "shall" in section 119–9–12, and limited its holding to that statute, as follows:

> [T]he fundamental question—and the one we first approach—is, irrespective of its lack of welfare money produced by its *ad velorem* [sic] tax, does a county have to defray 20% of the benefits awarded *under the aid to dependent children statutes* and of the costs incident thereto. We answer the question in the affirmative and hold that our statutes create such a mandate.

175 Colo. at 384, 487 P.2d at 1112 (emphasis added).

It is true that the *Billings* court found in section 119–1–15, 11 C.R.S. (1969 Perm. Cum.Supp.), the predecessor of current section 26–1–122, "a legislative intent that each county must bear 20% of the welfare costs expended by it." 175 Colo. at 385, 487 P.2d at 1112. However, the court deemed it "unnecessary" to decide the effect of the mill levy limit in section 119–3–6, 6 C.R.S. (1963), the precursor of the current section 26–1–125, on the issue before it:

> The appellees urge strongly that C.R. S.1963, 119–3–6 provides for a levy limit in Weld County of 3 mills for welfare purposes.... A ruling on this question is unnecessary as it is our holding that in some manner the counties must produce their 20%, whether it be from contingency funds, an excess levy, registered war-

rants (C.R.S.1963, 88–1–16), sales tax or otherwise.

175 Colo. at 388, 487 P.2d at 1114.

The statutory provisions under which the issue arises here are different from those confronted by the *Billings* court. Indeed, the Code has undergone repeal and reenactment with considerable reorganization and subsequent amendment since *Billings* was decided. The provisions of section 26–1–126, establishing a state-wide county contingency fund, merit particular attention, as the terms of this fund bear directly on the responsibilities of the counties to meet their county assistance payment requirements. (*See* Section VII, *infra.*) We thus find little in *Billings* that directly answers the Board's challenge to the present statutory scheme.

Section 26–1–122(1)(c) recognizes that the amounts generated by a county's social services tax levy may "prove insufficient to defray the county department's twenty percent share of actual costs" of some public assistance programs and requires counties to utilize "additional funds" to satisfy their actual needs in such circumstances. The Code establishes the following scheme for the funding of county obligations to pay the costs of public assistance programs. Each county is required to include within its annual property tax levy a sum sufficient to meet its share of public assistance. § 26–1–122(1)(a), 11 C.R.S. (1982). This share may not exceed twenty percent. *Id.* § 26–1–122(1)(d). In certain circumstances, as when counties receive sums from the county contingency fund, the share will be less than twenty percent. *See also id.* § 26–1–122(4)(d) (permitting Department to reimburse counties in excess of eighty percent whenever an emergency or temporary condition renders a county unable to meet its public assistance obligations).

 The tax levy referred to in section 26–1–122(1)(a) is the county's annual property tax levy.[16] Thus, the *dicta* in *Bill-*

---

**16.** The Local Government Budget law, in describing the funding capabilities of counties, distinguishes between *ad valorem* property taxes and other taxes such as sales or use taxes; references to tax levies are found only in con-

nection with discussions of the ability to impose property taxes. *See* §§ 29–1–101 to –608, 29–2–101 to –112 and 30–25–101 to –206, 12 C.R.S. (1977 & 1984 Supp.).

*ings,* to the effect that counties may utilize revenues from non-property based taxes to provide their share of revenues for public assistance, is not controlling here. We conclude that the present statutory scheme requires a county to satisfy its obligations to budget and appropriate its share of the costs of public assistance programs in the county from tax levies on property. If, as the county fiscal year progresses, revenues from the initial levy prove insufficient to satisfy the actual costs of the programs, then the county may utilize funds available from other sources as necessary to fulfill its public assistance program obligations.

These conclusions do not render the limitations of section 26–1–125(1) ineffective. Every county must determine initially whether a mill levy within the limitations of that section will be sufficient to defray its share of public assistance costs. If a county determines that the applicable mill levy will not satisfy such obligations, that county must seek permission from the Department of Local Affairs to impose a reasonable excess levy, pursuant to section 26–1–125(3).

This process furthers the purpose of the Code to "promote the public health and welfare of the people of the State of Colorado by providing ... programs relating to public assistance and welfare...." § 26–1–102, 11 C.R.S. (1982). If the mill levy limitations of section 26–1–125 were deemed absolute, some of these programs in some counties would be terminated due to lack of funds. Such terminations could well violate federal provisions requiring programs to be in effect in all political subdivisions of a state. *See* 42 U.S.C. §§ 302(a)(1), 602(a)(1), 1202(a)(1), 1352(a)(1) (1982). In construing statutes, we must choose a construction that serves the purposes of the legislative scheme, *Smith v. Myron Stratton Home,* 676 P.2d 1196 (Colo.1984), and must not strain to give language other than its plain meaning, unless the result is absurd. *See Harding v. Industrial Commission,* 183 Colo. 52, 515 P.2d 95 (1973). To construe the provisions of section 26–1–125 in a manner which

could jeopardize the stability of all federally assisted public assistance programs would indeed sanction an absurd result.

We conclude that under the Code counties must budget and appropriate sufficient funds from *ad valorem* property taxes to meet their respective shares of public assistance program costs. We further conclude that the provisions of section 26–1–125(1) do not constitute a limitation upon the amount of tax levy a county may impose to meet such obligations.

IV

The Board argues that the trial court erred in denying the Board's counterclaim against the Department for $96,000, which allegedly represents eighty percent of an overexpenditure for foster care costs made by the Board during its fiscal year 1981. We disagree.

The foster care program, like other general public assistance programs, is funded in part by the county and in part by the Department. In 1979, the General Assembly added a new provision to the Children's Code requiring the State Board of Social Services to adopt "a method for allocating to county departments funds appropriated for foster care." Ch. 179, sec. 10, § 19–3–120(1), 1979 Colo.Sess.Laws 748, 753. That statute provides in pertinent part, that "[t]he amount ... allocated to each county shall represent the maximum expenditure by an individual county for foster care ... which may be reimbursed." § 19–3–120(1), 8 C.R.S. (1984 Supp.). The statute further provides that the Department's obligations to reimburse county departments for eighty percent of foster care expenditures, as specified in section 26–1–122, is limited to the total foster care allocation made to each county. *See id.* § 19–3–120(2)(d), (e). Under the initial allocation plan, twenty-nine counties, including Pueblo County, received smaller sums than necessary to pay the costs of the foster care services actually provided. The Board's counterclaim sought reimbursement from the Department for a sum equivalent to eighty per-

cent of the total extra amounts spent by the Board in 1981.

■ The Board admits that the rule in section 19–3–120 prohibits a county from expending beyond its allocation. However, it contends that section 26–1–122(1)(d), 11 C.R.S. (1982), which prohibits a county from exceeding "its twenty percent share of actual costs" for public assistance, imposed a duty upon the State to develop an allocation formula which provides sufficient funds to meet the actual costs of foster care. This argument fails because it restricts the Department's duty to determine the amount of allocations on the basis of reimbursements whereas section 19–3–120 does the exact opposite by limiting reimbursements to the amount allocated.

The Board also relies on section 26–1–122(4)(b) and (c), 11 C.R.S. (1982), to support its argument. Section 26–1–122(4)(b) states in part that "eighty percent of the *amount expended* for assistance payments program costs and social services program costs shall be advanced to the county from the state treasurer...." (emphasis added). Section 26–1–122(4)(c) defines "program costs" as "[a]mounts expended for assistance payments and social services." The Board suggests that whatever it actually expended is a "program cost" which must be funded eighty percent by the State.

■ The Board erroneously assumes that any amounts it elected to spend for foster care in 1981 must be deemed "program costs." Obviously, only the costs of a program as authorized by law are program costs. The statute authorizing the 1981 foster care program here involved contained its own limitation on the maximum funds to be spent by participating counties. Thus, expenditures in excess of that allocation are not part of the "program costs" for foster care, and need not be funded by the Department. In reaching this conclusion we are not insensitive to the County's plight in 1981. It faced the predicament of trying to meet foster care responsibilities without being able to control the costs charged by foster care facilities and without a sufficient allocation from the Department. However, the County was not bound to provide for foster care unilaterally, and, in fact, section 26–1–122(1)(d) prohibited it from doing so. The County had other options; it could have sought to reduce services, as provided in section 26–1–122(5):

If in any fiscal year the annual appropriation by the general assembly for the state's share, together with any available federal funds for any income maintenance or social services program, or the administration of either, is not sufficient to advance to the counties the full eighty percent share of costs, said program or the administration thereof shall be temporarily reduced by the state board, so that all available state and federal funds shall continue to constitute eighty percent of the costs.

The insufficient allocation for foster care constituted, in effect, a temporary reduction in that program. We conclude that the County is not entitled to reimbursement for its 1981 foster care expenditures in excess of the amount allocated to it by the Department.

V

■ The Board also objects to the inclusion of certain programs by the Department in connection with the calculation of the county's duty to fund "twenty percent of the overall cost of providing the assistance payments, food stamps (except the value of the food stamp coupons) and social services" under section 26–1–122(1)(a). Certain portions of the Code require the Department to advance to the counties eighty percent of the costs of "administering assistance payments, food stamps and social services ... by the state treasurer from funds appropriated or made available for such purpose," section 26–1–122(3)(b), and the same percentage for "assistance payments program costs and social services program costs." § 26–1–122(4)(b), 11 C.R.S. (1982). In calculating these percentages, the Department includes programs which are funded entirely by either the federal government (Low-Income Home

Energy Assistance Payments) or the state government (old age pension).

The Board contends in essence that the inclusion of these "100% pass-through" programs in the county's twenty percent share improperly inflates the county's financial obligation. The trial court ruled that "insufficient evidence was presented on which to base a finding ... that the State Department is not properly determining its 80 percent share of the overall cost of welfare benefits." Although we believe that ample evidence was presented as to how the Department makes this determination, the real issue is one of statutory construction: whether benefits disbursed through the pass-through programs are "assistance payments" or "social services" as those terms are used in section 26-1-122(1)(a), and whether the monies advanced to the counties from the state out of federal grants or state appropriations are "funds appropriated or made available for such purpose" under section 26-1-122(3)(b), (4)(b). We conclude that the Department's method of allocating costs was appropriate.

The term "assistance payments" is defined by the Code as "financial assistance ... provided pursuant to rules and regulations adopted by the state department and includes *pensions, grants, and other money payments* to or on behalf of recipients." § 26-2-103(2), 11 C.R.S. (1982) (emphasis added). The old age pension, funded entirely by the state, is one of the pensions provided for in the Code. *See id.* §§ 26-2-113, -114. The Low-Income Home Energy Assistance Program is a "grant" program providing for "payments" to low-income households. *See* 42 U.S.C. § 8623 (1982). The federal funds provided for programs such as LEAP are "made available" for such programs; pensions are provided from "funds appropriated" by the State. Thus, both programs clearly fall within the definition of assistance payments, are funded as specified in the statute and are properly included among the programs from which the shares of both the county and the Department must be calculated.

The Board also contends that these funds are not utilized by the Department in computing the state's obligation to the county contingency fund described in section 26-1-126. Although evidence was presented as to how the state calculates this figure, this issue was not presented to the trial court and was not raised in the Board's motion for a new trial. Therefore, we decline to consider it.

## VI

■ The Board finally argues that the trial court erred in refusing to consider the testimony of certain past and present members of the Colorado General Assembly with regard to the legislative intent of the Code. We disagree.

At trial, the Board sought to introduce testimony from former State Representative Floyd M. Sack concerning the legislative intent underlying the Social Services Code as it was reenacted by House Bill 1003, ch. 340, 1973 Colo.Sess.Laws 1160. At that time, he was the prime sponsor of that bill. The Board also sought to introduce depositions of State Senator Martin Hatcher and State Representative Robert N. Shoemaker, the prime sponsors of House Bill 1569, ch. 361, 1977 Colo.Sess. Laws 1321, concerning the legislative intent of amendments made to the Social Services Code by that bill. Transcripts of legislative committee meetings, floor discussions and reports of the Colorado Legislative Council were also offered as evidence. The trial court admitted the transcripts and the reports, but ruled that it would not "permit any legislator to testify now as to what the legislative intent was at that time."

Remarks of a legislator made subsequent to the adoption of a statute concerning the intent of the legislation are, of course, not legislative history. *See Seven Islands Land Co. v. Maine Land Use Regulation Commission,* 450 A.2d 475 (Me. 1982) (per curiam). Courts have also expressed concern that the credibility of a legislator should not be placed in issue in judicial proceedings. For these and other

reasons, courts have generally held that subsequent comments about the intent of a legislature by a member of the legislature that enacted a particular statute are not admissible to establish the legislative intent of the statute. *See United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074 (5th Cir. 1980), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *Ambook Enterprises v. Time, Inc.*, 612 F.2d 604 (2d Cir. 1979), *cert. dismissed*, 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980); *see generally*, Singer, *Sutherland Statutory Construction*, §§ 48.15, .16 (4th ed. 1984).

There are sound reasons to conclude that, given the existence of recorded contemporary legislative history, post-passage testimony of a legislator concerning the intent of particular legislation should not be admitted into evidence on the question of legislative intent. The recollections of the legislator could hardly be challenged in the absence of contrary testimony of another member of the appropriate legislative body. If the views coincided with extant contemporaneous legislative history, the testimony would be duplicative; if it contradicted such history, the recorded history should be deemed controlling. *See State Wholesale Grocers v. Great Atlantic & Pacific Tea Co.*, 154 F.Supp. 471 (D.Ill. 1957), *aff'd in part, rev'd in part*, 258 F.2d 831 (7th Cir.1958), *cert. denied*, 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352 (1959). We conclude that when, as here, contemporaneous recorded legislative history is available, the exclusion of the post-enactment recollections of members of the legislature which enacted the statute is proper. We save for another day the question of whether, in the absence of any contemporaneous legislative history, such evidence might be admissible.

## VII

The Department asserts that the trial court erred in concluding that the state is required to fully fund the county contingency fund created by section 26–1–126, 11 C.R.S. (1982).[17] We affirm the trial court's decision.

Section 26–1–126 provides as follows:

**County contingency fund—creation.** (1) There is hereby created a county contingency fund which shall be expended to supplement county expenditures for public assistance as provided in this section.

(2) Notwithstanding the provisions of section 26–1–125(1), the state department shall make an advancement, in addition to that provided in section 26–1–122, out of the county contingency fund to any county if moneys equivalent to those raised by a levy of three mills on the property valued for assessment in the county are less than twenty percent of

---

17. The Department has framed the issue appealed by it as follows:

The Court erred by ruling that the State Department of Social Services must pay the full amount earned under C.R.S.1973, 26–1–126. The Department's arguments respecting this issue primarily set forth the contention that the trial court erroneously construed § 26–1–126. However, its contention that the courts cannot compel the legislative branch to make appropriations could be construed as implying that the trial court's decision cannot be given retrospective effect. *See Ground Water Commission v. Shanks*, 658 P.2d 847 (Colo.1983). Neither party has briefed this issue, although in its opening brief the Board describes the Department's position as follows:

The State seeks reversal of the order finding the County is entitled to reimbursement of all sums it has earned under the social services contingency fund (§ 26–1–126, C.R.S.) wheth-

er or not the State has appropriated monies for such reimbursement. The State further asserts the trial court should have given it's [sic] order prospective effect only.

The trial court's final judgment contains the following language:

That Pueblo County is entitled to reimbursement for the full amount "earned" under section 26–1–126, C.R.S.1973....

It is not clear whether this portion of the judgment is intended to constitute a money judgment in favor of the Board; if so, the computation of any sums here would require additional fact delineation to resolve disputes over amounts advanced to the Board by the Department to maintain public assistance services in the county. Because the parties have not argued the issue of whether a retrospectivity question lurks in the language of the trial court's order, we do not address such issue at this time.

the amount expended for administrative costs and program costs of public assistance, medical assistance, and food stamps.

(3) The amount of the additional advancement for each county for each month commencing on or after July 1, 1975, shall be fifty percent of the difference between the following:

(a) Twenty percent of the monthly amount expended for the purposes named in subsection (2) of this section, minus;

(b) The moneys equivalent to those raised by a levy of three mills on the property valued for assessment in the county divided by twelve.

(4) In the event appropriations are insufficient to cover advancements provided for in this section, all reimbursements shall be prorated on the basis of total claims submitted in proportion to funds available for reimbursement.

The county contingency fund was initially enacted in 1969. *See* Ch. 276, sec. 1, § 119-3-12, 1969 Colorado Sess.Laws 988. The 1969 act[18] provided that the fund *"may* be expended" to supplement county welfare expenses when the county social services levy "exceeded the maximum property tax levy permitted by statute for the support of the county welfare fund." *Id.* (emphasis added). It also provided that "[t]he degree of assistance to be furnished to any county under this section shall be determined ... with due regard to funds available and the relative need of the various counties." *Id.*

In 1973, when it repealed and reenacted the Code, the General Assembly materially altered the language of the county contingency fund provision. The 1973 act substituted "shall" for "may" preceding the Department's duty to supplement county expenditures and provided for supplementation by "advancement or reimbursement." It discarded the maximum property tax levies as the basis for qualifying to receive contingency fund monies and replaced it with the requirement that advancements "shall" be made to any county where "moneys equivalent to those raised by a levy of three mills on the property valued for assessment in the county are less than twenty percent" of public assistance costs. Finally, the 1973 act determined the amount of advancements or reimbursements according to the formula set forth in section 26-1-126(3) and added the language contained in subsection (4). *See* ch. 340, sec. 1, § 119-1-25, 1973 Colo.Sess.Laws 1160, 1177-78. In 1975, the General Assembly amended this section to the current form by deleting the term "reimbursement" from those sections establishing the means by which county funds are supplemented. *See* ch. 241, sec. 2, § 26-1-126, 1975 Colo.Sess.Laws 885, 886.

These changes are significant for purposes of statutory construction. By replacing the word "may" with "shall," the General Assembly indicated an intent to make mandatory the advancement of funds to qualifying counties. The references to section 26-1-122 pertaining to the Department's responsibility for funding eighty percent of public assistance programs subject to funds made available for that purpose, indicates that the contingency fund provision requires additional funding. The

---

**18.** The 1969 provision, § 119-3-12, 11 C.R.S. (1969 Perm.Cum.Supp.), stated as follows:

There is hereby created a county contingency fund which may be expended to supplement county expenditures for public assistance, county welfare administration, and child welfare services in counties which have levied a property tax, in the fiscal year preceding the request for funds from this account, for support of the county welfare fund and which tax is equal to or in excess of the maximum property tax levy permitted by statute for support of the county welfare fund; but no

county shall be eligible for assistance under this section until the state board of social services shall have caused the financial condition of the county to have been examined and shall have determined that the resources available to the county to meet its welfare needs are inadequate. The degree of assistance to be furnished any county under this section shall be determined by the state board of social services with due regard to funds available and the relative needs of the various counties.

reference to section 26–1–125, which contains both limitations and exceptions thereto concerning the ability of a county to assess a mill levy for public assistance programs (*see* Section III, *supra*), also supports the conclusion that by adopting this section the General Assembly provided a mechanism to ensure that counties required to provide specific levels of assistance to eligible persons under federal and state regulations defining eligibility and assistance level standards can be assured of their share of contingency fund monies to which their actual needs entitle them.

This statutory scheme recognizes that appropriations for "advancements" based on estimated expenditures may fall short of the amounts required because of actual expenditures. Thus "reimbursements" may be necessary in the event of errors in the initial estimation. This is sensible not only because county expenses will vary according to unforeseeable fluctuations in numbers of welfare recipients, but also because the budget processes of the state and of the counties do not coincide. By providing a practical procedure for accommodating estimates to realities, the General Assembly cannot be deemed to have undermined the mandate expressed by other provisions of the section and of the Code to the effect that any county experiencing county public assistance program costs in excess of the amount generated by a three mill levy can rely upon the contingency fund for additional funds.

This result is compelled by well established principles of statutory construction. One such principle requires that where possible, a statute is to be construed as a whole to give "consistent, harmonious and sensible effect to all its parts." *J.A. Tobin Construction Co. v. Weed*, 158 Colo. 430, 435, 407 P.2d 350, 353 (1965). In light of the clear mandate in subsections (1) through (3), we agree with the trial court that subsection (4) merely recognizes that state advancements may fall below the amounts actually needed to supplement county expenses. Whenever a shortage in "funds available" occurs, subsection (4)

provides for equitable distribution of the available monies pending full appropriation by the General Assembly.

The Department urges that this construction is untenable because "the courts cannot force the state to appropriate money to meet [its] obligations." This argument is not relevant to the issue presented here. The question is the meaning of the statute, not whether it may be judicially enforced. The Department also relies on *Rodgers v. Atencio*, 43 Colo.App. 268, 608 P.2d 813 (1979), to support its position. *Rodgers*, however, is inapposite because the statute there challenged expressly stated that certain benefits were to be provided "subject to available appropriations [§ 26–2–119, 11 C.R.S. (1973)]." Where a statute leaves the funding of a program to the General Assembly's discretion, obviously a court may not transform what is discretionary into a mandate. Here, however, the language is mandatory, not discretionary. We thus conclude, as did the trial court, that the statute requires sufficient funding of the county contingency fund to fulfill the justifiable claims of counties eligible for such assistance.

### VIII

In summary, we conclude that the funding provisions of the Code do not violate sections 3, 7 or 8 of Article X or Section 25 of Article II of the Colorado Constitution or the equal protection clause of the Fourteenth Amendment to the United States Constitution; that the provisions of section 26–1–125, 11 C.R.S. (1982), do not constitute an absolute limitation on the amount of mill levies counties may impose for funding of public assistance programs; that Pueblo County is not entitled to reimbursement for certain foster care costs it expended in 1981; that the Department did not improperly determine the percentage shares of the costs of public assistance programs in 1981; and that the Code requires the General Assembly to fund the county contingency fund established by section 26–1–126 to the extent required by actual expenses for public assistance pro-

grams incurred by counties which qualify for funds. The judgment of the trial court is, therefore, affirmed in all respects.