## No. 13,726.

## Estate of Hunter.

## Hughes et al., Executors *v.* State of Colorado et al.
### (49 P. [2d] 1009)

Decided September 9, 1935.

Messrs. Hughes & Dorsey, for plaintiff in error.

Mr. Paul P. Prosser, Attorney General, Mr. Charles Roach, First Assistant, Mr. Pierpont Fuller, Jr., Assistant, for defendants in error.

*En Banc.*

Mr. Justice Holland delivered the opinion of the court.

Plaintiffs in error, the executors, trustees and beneficiaries, under the terms of the will of Estelle B. Hunter, deceased, will be herein referred to as objectors, and defendants in error as the state.

In the course of administration in the county court, the estate was subject to an inheritance tax under the provisions of the statutes of the state of Colorado. The assess-

ment was made against the estate, approved by the court, and paid without objection in due course. In addition thereto, the estate was held to be subject to an additional tax under the provisions of chapter 145, Session Laws of 1933, which, including the title, is as follows:

"An act to provide funds for the payment of old age pensions and for the assistance of aged, indigent persons.

"Section 1. In addition to all other fees, charges, and impositions now fixed by law, there shall be assessed and collected by the Governmental Department, person, or party in charge, under whose jurisdiction the present collection is now required by law, the following fees, charges, sums and impositions, which fees, charges, impositions and sums are to be used for the purposes of this Act and not otherwise.

"(a) Ten per cent (10%) additional amount to the fees which are due and paid to the Secretary of State, upon incorporation of any corporation or association for profit.

"(b) An additional sum of One ($1.00) Dollar to be paid annually, for the registration or re-registration of motor vehicles.

"(c) Ten per cent (10%) additional upon the amount of any tax payable under the provisions of the inheritance tax laws of this State.

"In computing the amount of the additional tax as provided in this Section, the nearest multiple to five cents (5c) shall be taken in all cases."

To the order approving and confirming this ten per cent additional tax under paragraph (c), the objectors filed written objections, relating to the validity of the tax, as well as the amount ordered to be paid. Demurrers to these objections were sustained. Objectors elected to stand on the objections as made, and now prosecute this writ of error.

The contentions embraced in the objections are: That the act, under which the additional levy was made, conflicts with the following constitutional provisions:

"(a) Article X, Section 7, Colorado Constitution, which prohibits the General Assembly from imposing taxes for the purposes of any county, city, town or other municipal corporation;

"(b) Article X, Section 3, Colorado Constitution, which requires that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax;

"(c) Article V, Section 25, Colorado Constitution, which prohibits the General Assembly from passing local or special laws;

"(d) The provision of the Fourteenth Amendment to the Constitution of the United States, which prohibits the denial by any state to any person within its jurisdiction of the equal protection of the laws;

"(e) The provision of the Fourteenth Amendment to the Constitution of the United States, by which each state is prohibited from depriving any person of property without due process of law, and the like provision of Article II, Section 25, Colorado Constitution;

"(f) Article V, Section 21, Colorado Constitution, which provides that no bill except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title;

"(g) Article V, Section 24, Colorado Constitution, which provides that no law shall be revived or amended or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length."

Further grounds of objection are that: "Without waiver of or prejudice to said contention that the exaction here attempted to be imposed is wholly without authority and completely invalid, and the amount thereof, as here attempted to be imposed, is excessive and beyond authority of law, in that the 10% referred to in paragraph (c) of Section 1 of Chapter 145, Session Laws 1933 was in this instance applied, not to the amount of the

inheritance tax actually payable and paid in the Matter of the Estate of Estelle Hunter, Deceased, but to the amount thereof as it would have been if the payment thereof had not been made within six months after the death of said decedent.''

It is contended that the act imposes a new tax, distinct from the inheritance tax. We hold that the act is not susceptible to that interpretation. It is by appropriate words, definitely anchored to the operation of the existing inheritance tax law, with manifest intent that it be an additional and not a separate and distinct tax.

We approach the determination of the questions presented with abidance in the familiar rule, that we are not at liberty to hold an act unconstitutional, unless it is clearly so. If a reasonable doubt appears, the resolution of that doubt must be in a pronouncement of the validity of the questioned act. The objections presented may be discussed under three major heads. First: That the act imposes a tax for county purposes in violation of section 7, article 10, Colorado Constitution. Second: That it is in violation of the ''due process,'' ''uniformity,'' and ''equal protection'' clauses of both state and federal constitutions. Third: That it is in violation of sections 21 and 24, of article 5 of the Colorado Constitution which refer to the subject and titles of acts, and the amendment or extension of laws.

Section 7 of article 10, of the Colorado Constitution is as follows: ''The general assembly shall not impose taxes for the purposes of any county, city, town or other municipal corporation, but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation.''

A discussion similar to the one now before us occurred in the case of *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051, on an essentially different act there in question, which provided for the relief of the poor and destitute. This court, by the majority opinion, held that act to be for a county purpose. Since the announcement of that

decision, the present law has been enacted, and it is a reasonable presumption that the legislature at the time of the passage of the act here in question was cognizant of the declaration by this court, that as the law then stood, such was a county function, and with that realization, exercised its discretionary power in acting for, as it is said, the public good, and fixed and determined the purpose of this act as a state duty, and governmental function. That this is a legislative prerogative cannot be denied.

The test, as to ''county purposes,'' is, Is it for strictly county uses, for which the county or its inhabitants alone would benefit, or is it for a purpose in which the entire state is concerned or will benefit? In the existing law, chapter 144, S. L. 1933, counties as such are disregarded. The counties are, or any county is, left free to act, for what they, or it, may determine to be the particular or local need. The burden of supplying funds under chapter 144 rests solely upon the state. The state retains control of the funds so created and raised, but passes it in trust to the county commissioners, as trustees, subject to the order of the county court for its distribution.

■ Subsection (c) of section 1, chapter 145, S. L. 1933, is not subject to the objection that it lays an additional tax to that already authorized by law without specifically amending the existing law. We have numerous instances of levies, additional to those authorized by existing laws, and many such instances are to be found in ad valorem property taxes for state purposes or for the use of state institutions. Chapter 145, as a whole, imposes three additional excise taxes for only one purpose. This is permissible. This court has so announced with reference to our general revenue act of 1902, which imposed various excise taxes for general revenue. Such contemporary legislation lends strength to our exposition of the statute here in question.

■ As to the question whether subsection (c) of section 1, chapter 145, offends against section 7, article 10,

of the Constitution, in that it lays a tax for a county purpose, its solution must depend solely upon whether or not chapter 144, Session Laws 1933 (the Old Age Pension Act), so offends. As to this, chapter 144 has not been directly attacked in this case, but if subsection (c) section 1, chapter 145, is vulnerable to this objection, chapter 144 is likewise assailable. That chapter 144 does not so offend, is the irresistible conclusion to be drawn from the opinion of Mr. Justice Burke, of this court on petition for rehearing in the case of *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051. Quoting from that opinion, in which chapter 14, S. L. Ex. Sess. 1933, an act providing additional emergency relief funds by the imposition of additional registration fees upon motor vehicles to become a "County Emergency Relief Fund," limited to collections within the county and to be distributed by the "Board of County Commissioners," was held unconstitutional, we find the following: "This act fixes the duty, imposed by it, upon the county. * * * It provides for no assistance to any county from without. It is therefore a legislative declaration that a function to be discharged under it is a county function and that the tax imposed by it is for county purposes." Such cannot be said as to chapter 144, S. L. 1933, the latest legislative enactment on this subject, which lays a statewide tax for a purpose that is without county limitations.

The Constitution neither defines "county purpose" nor prevents the legislature from doing so. It does prevent the legislature from singling out, at its pleasure, one or more counties, levying a tax upon the property therein for the uses and purposes singular to such county or counties, which would be of no statewide interest or concern, but does not prevent the levy of a tax, the distribution of which will reach the beneficial subjects wherever located, within the state, according to proportionate needs. This then becomes a common burden of government which rests upon all subjects thereof, as each may be affected. The constitutional section under discussion

(section 7, article X) contains a specific restriction upon the legislature, and in turn provides for a specific grant to the county. It is evident that this right, which the legislature was empowered to give to a county, town or municipality to exercise for itself, was withheld from the legislature, undoubtedly with the view that the limited needs, uses and purposes of such local communities could be better determined by those directly affected. This would include the purpose here involved, if it still remained a county function or purpose; but under the present act, the county and its officials are stripped of all authority except as trustees for its distribution.

■■ The state has by this act declared this to be a public purpose, designated its uses, and by further and additional tax, placed the proceeds in the public treasury. If distribution thereof is made for public uses and purposes, as directed, it is not offensive to the "due process" constitutional provisions nor to the "equal protection" and "uniformity" clauses, since as to equality, exactness is not required. *Magoun v. Ill. Tr. & Sav. Bk.*, 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037. It must operate the same on all subjects under like circumstances, only in its imposition. The tax here imposed, as hereinbefore stated, is a further and additional tax, directly akin to the present inheritance tax provisions. That these provisions are not in violation of the "equal protection" and "due process" clauses, has long been settled, and in addition thereto they have been declared by this court to be excise taxes and not subject to the application of the "uniformity" clause, since that applies only to direct or ad valorem taxes. The argument that the tax falls only upon a certain class, if sound, would be applicable to all excise taxes, as such are paid by those who enjoy the privilege taxed. If legally taken from the taxpayer and applied to lawful governmental uses, his concern is ended. The public nature of the tax is not changed because few directly benefit. Those who benefit from an inheritance and are required to pay the tax, in turn bene-

fit directly or indirectly, as the case may be, like other citizens, from the tax they have paid. The same authorities, who now have the right to adjudicate the same subject-matter, that of inheritance tax, are vested with the enforcement and collection of the tax imposed by the present act.

Reference to the title of the act discloses clearly, and without doubt, one distinct subject. That is to provide funds. Whatever means, if one or more, that may be resorted to for carrying out the object, other subjects are not thereby added. The ways designated are germane to the purpose, and are, therefore, incident to, and within the title.

It is contended that subsections (a) and (b) of the act, chapter 145, S. L. 1933, imposing additional corporation filing fee, and additional motor vehicle fees, are police regulations, and that the additional inheritance tax under subsection (c) is imposed by the taxing power. This refinement does not affect the act, as all the taxes thereby imposed are for revenue, and not laid under police regulations. If subsection (c) of section 1 of the act, upon which the attack is directed, standing alone does not violate section 24, article 5 of the Constitution, then that part of the act would endure by virtue of the general severability rule. That it does not so violate is clear, when it appears that for the enforcement of its purpose, it relates to and necessarily refers to a general law. *Denver Circle R. Co. v. Nestor,* 10 Colo. 403, 15 Pac. 714.

The judgment is affirmed.

MR. JUSTICE CAMPBELL and MR. JUSTICE HILLIARD dissent.

MR. JUSTICE HILLIARD, dissenting.

Gray is the product of the admixture of black and white. The decision of the court in this matter is gray, and is itself a product of the times. Such decisions are inevitable if the courts fail—as has the court here—to

distinguish between the respective duties of the judiciary and the legislature. Legislatures may, and more often should than not, be swayed by the times and the temper of the times. Courts should never, under any circumstances or upon any pretext, consider the consequences of their decisions. Their duty, and their only duty, is to apply the law to the facts that appear. Beyond doubt the court has permitted its judgment in the case at bar to be influenced by the unmistakably laudable purpose of the legislation in question. But the service of a good purpose cannot excuse the making of bad law, nor, in final analysis, is the result desirable, for when the good purpose has been served the bad precedent remains to serve bad purposes. All lawyers know this; I am sorry the court has forgotten it. As I have said, the decision of the court is gray. It adopts as law what amount only to arguments in favor of a policy of government. That which should sway the opinion of the legislature is permitted to form the opinion of the Justices. Thus the fundamentals of our government are perverted and destroyed. I venture to say that my brethren have mistaken the concept of their function. We are the servants of the Constitution, not its masters. We must uphold the Constitution, not trample upon it. If we believe that document to be outmoded and the stifler of progress it is not difficult for us, as individuals, to determine what we should do. We may agitate for its amendment, one of our prime duties as citizens. We may resign our posts, certainly our obligation if we are in revolt against the instrument which created our power. Perhaps the best form of government is one where the powers of the legislature are without limit. If so, let us, as individuals, demand that form of government. But let us not, in heaven's name, give pretended reverence to that which we have made a scrap of paper. Let there be either a constitution or no constitution; and if there be a constitution let us do honor to it other than in the breach.

There is no real distinction between this controversy

and that in *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051. Here, as there, I am persuaded, an unlawful imposition has been made for a county purpose. The legislature has but thinly, if at all, converted the purpose of the act concerning old age pensions from that of the several counties to that of the state as a whole. This is manifest if we consider only the one feature that the amounts received by pensioners in similar circumstances vary according to their residence in one county or another. The primary concept, that each community can best judge who are its poor and how much they should be relieved, has not been altered. But the court, anxious to promote what is, in my belief, as desirable an end as any legislation ever enacted in this state has sought, has not hesitated to brush aside the Constitution. This is most lamentable; the evil outweighs the good. The beneficial old age pension act, meagre in its gratuities, will be the prop for tax-spending orgies beyond prediction. Little good; much harm. We have permitted by indirection that which the people emphatically forbade when, in the general election of 1934, they refused amendment of Article X of the Constitution to remove all limitations upon the power of the General Assembly in respect of taxation.

To reject this law would not leave the General Assembly powerless to relieve the deserving aged. It would but put our stamp of disapproval upon methods of raising revenue that are repugnant to the Constitution, and to their distribution in a manner therein forbidden. The provisions of which this legislation falls afoul were not intended, as the thoughtless seem to think, to thwart proper and forward-looking laws. They were put there, and should be enforced, so that injustice, inequality and oppression shall not flourish. They were designed that the burdens of taxation should be equitably imposed, and that the revenues of taxation should be equitably distributed. Against both of these principles this law grievously offends. As to the latter, I have already adverted; to the former I now address myself.

It is charged by the plaintiffs in error that the act contravenes section 3 of article X of our Constitution, and the Fourteenth Amendment to the Constitution of the United States. Both of these contentions the court dismisses very lightly. As to section 3 of article X, the opinion is content to say merely that we have hitherto determined that ''an excise tax'' is ''not subject to the application of the 'uniformity clause.' '' I hardly believe the proposition is so simple, and suggest, without elaboration, that as to an excise uniformity does require reasonable and proper classification of those who are to pay it. *Kansas City v. Whipple,* 136 Mo. 475, 38 S. W. 295, 35 L. R. A. 747. Neither, in my opinion, is it an answer to the objections made in respect of the Constitution of the United States to say that the law ''is not offensive to the 'due process' constitutional provisions nor to the 'equal protection' and 'uniformity' clause since as to equality, exactness is not required'' Perhaps that is a fair statement of the law as to the facts existing in *Magoun v. Illinois Trust and Savings Bank,* 170 U. S. 283. But what are the facts here? The sole purpose and the specific purpose of the act before us is to provide funds with which to pay old age pensions, i. e., for the support of the aged poor. Upon whom does this duty rest? Aside from the duty arising from relationship, the general duty rests upon society at large. If that be a state duty and its fulfillment a state purpose, there is not the slightest doubt that it rests equally upon all the taxpayers of the state and must be borne by all, each in proportion to his financial ability to respond. If it is a county duty and its fulfillment a county purpose, as I believe it to be, the same is true of all the taxpayers of the counties respectively. These facts, however, the act completely disregards. The tax imposed is statewide in its application; but, by the express terms of the act, it is made to apply only to a limited portion of the taxpayers, all others being exempt. Thus all of the taxpayers are, by the act, divided into two classes, one bearing the entire burden of the tax, the

other bearing none. What are the distinctions between these two classes of taxpayers which the legislature deemed sufficient to justify this discrimination? The class made subject to the tax consists solely of those who either incorporate a company or register or reregister a motor vehicle or pay an inheritance tax or do two or more of these things. All others are exempt. Considering the object and purpose of the act it is obvious that the classification adopted is wholly arbitrary. The circumstances or events which bring one within the class upon which alone the burden of the tax is placed are fortuitous and accidental. They have no relation either to the duty to support the aged poor or to the extent of that obligation measured by the ability to pay. A classification based upon the color of the eyes would have been no more arbitrary or artificial. But the act does not stop with this main classification. Within the principal class upon which alone the entire burden of the tax rests are made subclassifications which result in manifest inequalities and produce complete lack of uniformity as between the subclassifications of the principal classification. These subclasses are (a) those who incorporate a company are required to pay ten per cent of the fees of the secretary of state; (b) those who register or reregister a motor vehicle must pay $1 per annum for each vehicle registered or reregistered; and (c) those who are required to pay an inheritance tax must pay ten per cent of the amount of the inheritance tax. It is certain that the amount of old age pension tax paid by the respective subclasses will, as between the classes, bear no reasonable or logical relationship one to another, or to the ability of the respective taxpayers to pay, or to the extent of the duty resting upon each to support the aged poor. One who, whatever his reason, incorporates a company with a large authorized capital pays more than one who incorporates for a smaller amount, but this has nothing whatever to do with the extent of his duty to support the aged poor or with his financial ability to discharge that duty. Every-

one who registers or reregisters a motor vehicle must pay $1 annually. The registration or reregistration of a motor vehicle indicates in no way the extent of the duty of the registrant to support the aged poor or his financial ability to respond to that duty. The rich man may register but one vehicle, whereas the poorer man may register several. The poor man must pay a greater old age pension tax than the rich man. Moreover, in this instance, opposed to those in subclassifications (a) and (c), the obligation arises annually while the others pay only when a company is incorporated or an inheritance tax paid, events of uncertain occurrence and which may never happen. And there are classifications in the subclassifications. A rich man may receive a small inheritance, a poor man a large one. Brother Jack, a rich man, may receive a large inheritance and pay little tax. Poor Cousin Emma receives a smaller bequest but her inheritance tax is large. Degrees of relationship and lack of relationship to a decedent are the controlling factors in determining the amount of old age pension tax to be paid, not the degree of duty to the aged poor or the ability to contribute to their relief. Such is the astounding mandate of the act before us. Plainly, as the Supreme Court of the United States said of an enactment under its consideration, it may be said here that "the operation of the statute is unjustifiably unequal, whimsical and arbitrary." *Stewart Dry Goods Co. v. Lewis* (U. S.), 79 Law. Ed. 539. See, also, *Gulf, etc., Co. v. Ellis,* 165 U. S. 150, 17 Sup. Ct. 255; *A. T. & S. F. R. R. Co. v. Matthews,* 174 U. S. 96, 19 Sup. Ct. 609; *Cotting v. Kansas City Co.,* 183 U. S. 79, 22 Sup. Ct. 30; *Frost v. Corporation Com.,* 278 U. S. 515, 49 Sup. Ct. 235; *Smith v. Cahoon,* 283 U. S. 553, 51 Sup. Ct. 582; *Southern Ry. Co. v. Greene,* 216 U. S. 400, 30 Sup. Ct. 287; *Royster Guano Co. v. Virginia,* 253 U. S. 412, 40 Sup. Ct. 560; *Bethlehem Motors Co. v. Flint,* 256 U. S. 421, 41 Sup. Ct. 571; *Kansas City Southern Ry. v. Road Improvement District,* 256 U. S. 658, 41 Sup. Ct. 604; *Air-way Corp. v. Day,* 266 U. S. 71, 45 Sup. Ct. 12;

*Schlesinger v. Wisconsin,* 270 U. S. 230, 46 Sup. Ct. 260; *Louisville Gas Co. v. Coleman,* 277 U. S. 32, 48 Sup. Ct. 423; *Quaker City Cab Co. v. Pennsylvania,* 277 U. S. 389, 48 Sup. Ct. 553, *Iowa-Des Moines National Bank v. Bennett,* 284 U. S. 239, 52 Sup. Ct. 133; *Liggett Co. v. Lee,* 288 U. S. 517, 53 Sup. Ct. 481; *State v. Haun,* 61 Kans. 146, 59 Pac. 340; *In re Kotta,* 187 Cal. 27, 200 Pac. 957; *People v. Yosemite Lumber Co.,* 191 Cal. 267, 216 Pac. 39; *Leonard v. Reed,* 46 Colo. 307, 104 Pac. 410; and *Smith v. Farr,* 46 Colo. 364, 104 Pac. 401.

The constitutional provisions above mentioned are based, it has been said, upon and inspired by fundamental concepts of social justice and good government. Judge Cooley (1 *Cooley on Taxation,* (4th Ed.) 650, §314) has stated with great vigor and irrefutable logic certain principles of the law with respect to equality and uniformity of taxation. His words are completely in point and I quote them (author's italics):

"Taxes are collected as *proportionate* contributions to public purposes. But to make them such in any true sense, they must not only be such as between the persons called upon to pay them, but also as between these who *'ought'* to pay them. * * *

" 'If the legislature should arbitrarily designate a certain class of persons on whom to impose a tax, either for general purposes or for a local object of a public nature, without any reference to any rule of proportion whatever, having no regard to the share of public charges which each ought to pay relatively to that borne by all others, or to any supposed peculiar benefit or profit which would accrue to those made subject to the tax which would not inure to others, so that in effect the burden would fall on those who had been selected only for the reason that they might be made subject to the tax, we cannot doubt that the imposition of it would be an unlawful exercise of power, not warranted by the constitution, against the exercise of which a person aggrieved might sue for protection.' * * *.

"The cases suggested are extreme cases, but the principle that controls them is universal, and a disregard of it is fatal to the tax; and whether the unjust consequences are slight or serious is unimportant. Where the principles of taxation are disregarded, everyone is entitled to claim strict legal right; for in no other way can the power be restrained from perversion and oppression * * *. To any extent that one man is compelled to pay in order to relieve others of a public burden properly resting upon them, his property is taken for private purposes, as plainly and as palpably as it would be if appropriated to the payment of the debts or the discharge of obligations which the person thus relieved by his payments might owe to private parties. 'By taxation,' it is said in a leading case, 'is meant a certain mode of raising revenue for a public purpose in which the community that pays it has an interest. An act of the legislature authorizing contributions to be levied for a mere private purpose, or for a purpose which, though it be public, is one in which the people from whom they are exacted have no interest, would not be a law, but a sentence commanding the periodical payment of certain sums by one portion or class of people to another.' This principle has met with universal acceptance and approval because it is as sound in morals as it is in law."

I can draw but one conclusion: that the act is plainly, and beyond any doubt whatever, violative of the Fourteenth Amendment. The classes singled out to bear this tax were selected capriciously. There is no relation between their duty to the aged poor and their duty and ability to pay this tax for the care of the aged poor. Classifications of that kind are obnoxious, for "* * * the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the Fourteenth Amendment, and * * * in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted

classification—and is not a mere arbitrary selection.''
*Gulf, etc., Co. v. Ellis, supra.*

The court has said that the legislature has the right and power to impose these arbitrary taxes upon an arbitrary class for an arbitrarily determined purpose. It has said that these new levies, so imposed and so used, are properly levied and properly disbursed. Little actual damage, one may say, but the potentialities are without limit. Clayton C. Dorsey, Esq., of counsel here for the plaintiffs in error, appeared as amicus curiae in *Wade v. State,* 97 Colo. 52, 47 P. (2d) 412. In his brief in that matter, discussing the revenues of the state, he drew our attention to some remarkable things. He said:

''The extent to which the State now imposes excises and the amount of the revenue derived therefrom is demonstrated by the last biennial report of the Auditor of State for the fiscal years ending June 30, 1933, and June 30, 1934, of which, since it is a public document, the Court may take judicial notice. From the tabulation on page 8 of said report it appears that in the fiscal year ending June 30, 1933, the total revenue derived by the State from the direct property tax was $4,171,976.17, and the total cash received by the State from other sources was $16,575,352.26; and that in the fiscal year ending June 30, 1934, the total revenue derived by the State from the direct property tax was $3,826,623.70 and the total cash received by the State from other sources was $21,-169,508.10. In the tabulation on page 34 of said report the 'Miscellaneous Collections' from sources other than the property tax are broken down into items for each of said years. Eliminating therefrom every item of receipts other than revenue derived from excises, it appears that in the fiscal year ending June 30, 1933, the revenue derived from excises alone was a sum in excess of $9,-576,000, to be compared with $4,171,976.17, the product in that year of the direct property tax; and that in the fiscal year ending June 30, 1934, the revenue derived from excises alone was a sum in excess of $12,176,000, to be

compared with $3,826,623.70, the product in that year of the direct property tax. Thus it appears that in the fiscal year ending June 30, 1933, the State revenue derived from excises was more than twice as great as that derived from the property tax; and that in the fiscal year ending June 30, 1934, it was more than three times as great. Moreover, the General Assembly now in session has imposed an excise tax on retail sales, now in effect, the estimated yield of which is $6,000,000 per annum * * *.

"These facts are brought to the attention of the Court to emphasize the importance of the question here presented. The trend of the times is clear. The taxing power is rapidly shifting from property taxes to excise taxes. Even now the product of excises imposed by the State greatly exceeds that of the property tax. The disproportion between the two is rapidly increasing. There is reason to believe that in the near future excise taxes will nearly, if not wholly, replace property taxes. This being so, the Court is now confronted with the grave responsibility of determining whether this vast power to impose excises for revenue is wholly free from constitutional restriction * * *."

Counsel's warning is timely indeed. I agree entirely with his conclusions, except I fear the property tax will never be replaced. The only thing to apprehend in that regard is that there will be greater default in payment of property taxes, for as excises mount the ability of the owner to pay direct property taxes decreases. I have no doubt that if all excises were now repealed our people would experience little difficulty in meeting what we are pleased to term general taxes. The gravity of the problem, however, is observed when the opinion of the court in this matter and Mr. Dorsey's observations are read together. The present yield of excises cannot be much less than $20,000,000 a year. Over the expenditure of this vast sum we have determined the Constitution has no control. Upon whom it may be levied and to whom and how it may be disbursed we have held there is no limita-

tion. That it may be anticipated and pledged away for years to come is likewise constitutionally possible. *Johnson v. McDonald,* 97 Colo. 324, 49 P. (2d) 1017. Thus, in the midst of abundance, we are in want. Our penal institutions are crowded and are schools of crime rather than places of reform—for lack of funds. Our places for the confinement of the insane are a disgrace and shame—for lack of funds. Our roads are rough and unfinished—for lack of funds. Our civil servants are underpaid and our offices undermanned—for lack of funds. Our poor are unclothed and hungry—for lack of funds. What, then, may I inquire, becomes of all this revenue? And let me offer this suggestion: That the devotion of the energy now expended in seeking means of evading the Constitution to the curbing of riotous waste of public funds will take care of all worthy objects of government and reduce taxes at the same time. It is my studied opinion that the present course of Constitution evasion, if persisted in, can only, and will, result in chaos.