MOUNTAIN STATES TELEPHONE AND TELEGRAPH CO., Plaintiff and Appellant,

v.

GARFIELD COUNTY; The Garfield County Board of County Commissioners; Thomas Hatch, Sherrell Ott and Louis Liston, County Commissioners; Judy Henrie, County Treasurer; Tom Simkins, County Assessor; The Utah State Tax Commission; R.H. "Hal" Hansen, Roger O. Tew, G. Blaine Davis and Joe B. Pacheco, Utah State Tax Commissioners; Tom L. Allen, Utah State Auditor; Edward T. Alter, Utah State Treasurer, Defendants and Appellees.

No. 880435.

Supreme Court of Utah.

May 1, 1991.

Mark K. Buchi, Lee R. Curtis, Jr., Richard G. Wilkins, Richie D. Haddock, Salt Lake City, for plaintiff and appellant.

Patrick Nolan, Panguitch, County atty., Bill Thomas Peters and Karl Hendrickson, Salt Lake City, for Garfield County.

R. Paul Van Dam, Ralph Finlayson, Salt Lake City, for State Tax Com'n, State Auditor, and State Treasurer.

HOWE, Associate Chief Justice:

This is an appeal by plaintiff Mountain States Telephone and Telegraph Company from a decision and summary judgment upholding the constitutionality of Utah Code Ann. § 17–19–15 (Supp.1987), which requires the imposition of a statewide uniform levy upon real property to fund local property tax assessment, collection, and distribution costs.[1]

## I. FACTS

Prior to the adoption of the statute in 1986, each county funded its own costs incurred in the imposition and collection of ad valorem property taxes. Each county included the projected amount of such costs in its annual budget and set its levy at a level sufficient to generate revenues to cover all budgeted county costs. The state participated in neither the process of estab-

---

1. Utah Code Ann. § 17–19–15 (Supp.1987):

(1) To promote appraisal and equalization of property values and effective collection and distribution of property tax proceeds the county governing body of each county annually shall separately budget for all costs incurred in the assessment, collection, and distribution of property taxes and related appraisal programs and submit those budgets to the state auditor for review.

(2) The state auditor shall establish, by rule, categories of allowable costs and shall certify submitted budgets for compliance with approved categories.

(3) Upon review and certification by the state auditor, the aggregated state-wide costs shall be transmitted to the State Tax Commission for determination of a mandatory state-wide tax rate sufficient to meet those expenditures. By June 8 of each year the tax commission shall certify the rate to each county auditor for inclusion upon the tax notice as a separately listed and identified local levy.

(4) The tax rate may not exceed a maximum of .0005 of assessed valuation except for: (a) mandated or formally adopted reap-

praisal programs conforming to tax commission rules; or (b) actions required to meet legislative, judicial, or administrative orders. Taxes levied for this purpose may not be included in determining the maximum allowable levy for the county or any other taxing district.

(5) In the initial year that the levy adopted under this section is effective, each taxing district within counties which had not previously levied separate assessing, collecting, and distributing levies, shall reduce its property tax levy by an amount equal to that paid by the taxing district in the previous year for the cost of assessing, collecting, and distributing taxes.

(6) Revenues received by each county from the levy authorized by this section in excess of the amount set out in the certified budget shall be transmitted to the state treasurer for equalization and distribution to the counties in accordance with the certified budgets. Any revenue excess resulting from an increase in collection rates upon final settlement shall be deposited by the state treasurer in a trust account to be adjusted against subsequent years.

lishing a budget for county assessment and collection costs nor the levying of taxes to fund these costs; these responsibilities were left totally to the counties.

Under the statute, the governing body of each county determines the county's cost of "assessment, collection, and distribution of property taxes and related appraisal programs." § 17–19–15(1). That cost determination is submitted to the state auditor, who is required to establish "categories of allowable costs" for tax collection budgets throughout the state. The auditor reviews each county budget as it is submitted and certifies that it complies "with approved categories" of cost. § 17–19–15(2).

Following certification and review by the state auditor, all approved county budgets are "transmitted to the State Tax Commission for determination of a mandatory statewide tax rate sufficient to meet those expenditures," provided the tax rate does not exceed a maximum of .0005 of assessed valuation. § 17–19–15(3), (4). This statewide tax rate is included on tax notices in each county as "a separately listed and identified *local* levy." § 17–19–15(3) (emphasis added). It is questionable whether the counties have any discretion to alter or reject the levy certified to them by the state tax commission or whether the state auditor has the power to disapprove a figure and require it to be revised.

Any revenue collected by a county under the local levy in excess of its approved budget does not remain with that county. Rather, the money is "transmitted to the state treasurer" and is redistributed to counties having tax collection budget shortfalls "in accordance with the certified [tax collection] budgets." § 17–19–15(6).

Pursuant to the statute, defendants Garfield County and its officers levied a separate tax of $2,692.21 on Mountain States' 1987 property tax notice. Mountain States paid the tax under protest and then filed this action for declaratory relief and recovery of the taxes. County defendants moved for summary judgment. Mountain States opposed the county's motion and

filed its own cross-motion for summary judgment on its facial challenges to the Act. Further, it requested the trial court to postpone ruling on the county's motion until completion of requested discovery pursuant to rule 56(f), Utah Rules of Civil Procedure.

Mountain States contended that article XIII, section 5 of the Utah Constitution had been violated. That section provides:

The Legislature shall not impose taxes for the purpose of any county, city, town or other municipal corporation, but may, by law, vest in the corporate authorities thereof, respectively, the power to assess and collect taxes for all purposes of such corporation. Notwithstanding anything to the contrary contained in this Constitution, political subdivisions may share their tax and other revenues with other political subdivisions as provided by statute.[2]

Mountain States argued that the statute impermissibly imposed a tax for county purposes in violation of the first sentence of section 5 and mandated horizontal revenue sharing, which the second sentence prohibits. It also requested the trial court to postpone ruling on the county's motion until completion of requested discovery.

The court granted summary judgment in favor of Garfield County. It found that the "funding mechanism" established by the statute "address[es] a matter of statewide concern ... including the accurate, equitable and fair assessment of locally assessed residential, commercial and industrial properties, and the effective, efficient collection of ad valorem property tax revenues." The court held that equalized and efficient property tax assessment and collection was a statewide purpose. It also addressed the revenue sharing aspects of Mountain States' article XIII, section 5 challenge by concluding summarily that the revenue sharing aspects of the statute were valid under this court's rulings in *Tribe v. Salt Lake City Corp.*, 540 P.2d 499 (Utah 1975), and *Salt Lake County v. Murray City Redevelopment*, 598 P.2d

---

2. The first sentence only was in the original 1895 constitution. The second sentence was added by amendment in 1983 and has not heretofore been raised in any case in this court.

1339 (Utah 1979). The court further held that Garfield County had consented to the revenue sharing aspects of the statute by adopting its assessment and collection budget. With respect to Mountain States' fourth through eighth claims for relief, which raised due process, equal protection, and the taking of private property arguments, the court concluded that because the local levy is a "tax" and not a "fee," each of those causes of action "[is] inappropriate and accordingly must be dismissed." A catch-all ruling was made that the act "is constitutional in all respects." The court ordered Mountain States' complaint dismissed with prejudice.

Mountain States appeals, assailing section 17–19–15 on several constitutional grounds. It also contends that summary judgment was improper because its discovery was incomplete and that further discovery was needed to develop its objections to the statute. We shall separately consider these assignments of error.

## II. STANDARD OF REVIEW

We apply a presumption of validity to legislative enactments when attacked on constitutional grounds. *City of West Jordan v. Utah State Retirement Bd.*, 767 P.2d 530, 532 (Utah 1988). The burden is on the petitioner to demonstrate the unconstitutionality of the statute. *Amax Magnesium Corp. v. Utah State Tax Comm'n*, 796 P.2d 1256 (Utah 1990); *Rio Algom Corp. v. San Juan County*, 681 P.2d 184, 191 (Utah 1984); *Lehi City v. Meiling*, 87 Utah 237, 48 P.2d 530, 535 (1935). Further, this court will construe a statute to be constitutional where such construction is reasonable:

> [W]e must be mindful of the rule that an act of the Legislature will not be declared unconstitutional if it can reasonably be construed to be constitutional. Where the language of a statute is equally susceptible to two constructions, one rendering it valid and the other invalid, the court must adopt the one which renders the statute valid.

*Best Foods, Inc. v. Christensen*, 75 Utah 392, 285 P. 1001, 1004 (1930) (citations omitted).

## III. STATE v. LOCAL PURPOSE

We have long recognized that the purpose of the first sentence of article XIII, section 5 was to ensure the right of the people of Utah to local self-government. "It was to preserve local self-government free from needless legislative interference that the power to levy taxes for local purposes was by the state constitution vested exclusively in the proper authority of counties, cities, towns, and other municipal corporations." *Best Foods*, 285 P. at 1003. Section 5 has been said to complement other sections of our constitution which provide for the establishment of a system of uniform county governments, article XI, section 4; which recognize the existence of the several counties as legal subdivisions of the state, article XI, section 1; which prohibit the legislature from changing county lines without a vote of the electors of the counties involved, article XI, section 3; and which prohibit the state from assuming the debt of any county, article XIV, section 6. *State ex rel. Wright v. Standford*, 24 Utah 148, 66 P. 1061 (1901). We observed in *Wright*:

> An examination into its early history will show the existence of a system of territorial subdivisions of the state into counties when the present constitution was adopted. At this early date the system of local self-government existed under the general laws of the territory, and there is no provision in the constitution which can be construed as impairing that right.... The constitution was doubtless framed and adopted with the purpose to protect the local self-governments which had existed of a practically uniform character from the early settlement of the country, since which they have remained undisturbed, the continued existence of which is therein assumed, and from which the liberty of the people spring and depend.

66 P. at 1062.

On another occasion, this court remarked that section 5 indicates "an intention to

have local business transacted and local affairs managed and controlled by local authorities." *State ex rel. Salt Lake City v. Eldredge*, 27 Utah 477, 76 P. 337, 340 (1904).

In the first decade of our statehood, this court on two occasions found that acts of the legislature contravened section 5. In *State ex rel. Wright v. Standford*, we struck down a statute which required the boards of county commissioners of certain counties to appoint a county fruit tree inspector from a list of three names furnished by a member of the Utah State Board of Horticulture. 24 Utah 148, 66 P. 1061. The inspector performed his services under the direction of a member of the state board and had the right to appoint deputy inspectors under certain circumstances as they were needed. The inspector and his deputies were employed for such time as the board directed. The legislature fixed their compensation and directed that it be paid monthly out of county funds. We viewed the statute as placing in the inspector and the board the administration of the affairs of the county, with power to create a debt for the county to pay and, indirectly, the power to tax the county for the payment of that debt. This took away from such county the right to choose or appoint its own officers and compelled it to levy and collect taxes with which to pay such officers their salaries as fixed by the act. We found the act offensive in that the county commissioners had no supervisory control over the inspectors or the deputies and were not even able to determine the time or character of their employment; they were in no sense county officers.

In the second case, *State ex rel. Salt Lake City v. Eldredge*, we found that section 5 would be contravened if a statute could be construed to allow the state board of equalization to adjust and equalize the valuation of property for the purposes of taxation within a county. 27 Utah 477, 76 P. 337. We held that the language of section 5 vesting in local authorities "the power to assess and collect taxes for all

purposes of such corporation" included the valuation of property as well as the levying of the rate of taxation.[3]

Later, in *Smith v. Carbon County*, 90 Utah 560, 63 P.2d 259 (1936), we held that a "fee" charged by county court clerks for filing the inventory and appraisement in probate proceedings was in reality a tax since it was based on the appraised value of the estate. As such, it offended section 5 in that it constituted a tax imposed by the legislature for the purpose of a county.

In all other cases coming before this court where article XIII, section 5 challenges were made to legislation, we have found no violation. In *Salt Lake County v. Salt Lake City*, 42 Utah 548, 134 P. 560 (1913), we examined a statute that required the county commission in all counties containing cities of the first and second class to establish a detention home for delinquent children. The county was authorized to recover from the cities a reasonable sum for the support and maintenance of the delinquent children from such cities. This court held that the statute did not violate section 5 because there was no interference with municipal self-government. We viewed the statute as imposing upon cities as arms of the state some of the state's governmental functions. We wrote:

> The state, as we have already pointed out, in enacting the law in question, simply calls upon its agencies, the counties, and the cities to assist in discharging a public duty which in no way affects local self-government.

*Id.*, 134 P. at 564. Again, in *Bailey v. Van Dyke*, 66 Utah 184, 240 P. 454 (1925), we found no violation of section 5 by a statute which authorized county commissioners to enter into contracts for agricultural extension work and to provide funds therefor. We observed, "There is no imposition of taxes, direct or indirect, by legislative authority upon the county, and no interference with local self-government by the county." *Id.*, 240 P. at 457.

---

**3.** As will be later pointed out in this opinion, article XIII has been amended on several occasions since our decision in *State ex rel. Salt*

*Lake City v. Eldredge* to give the state broad powers of equalization respecting property situated within a single county.

No contravention of section 5 was found in *Best Foods v. Christensen*, 75 Utah 392, 285 P. 1001 (1930), where this court considered a constitutional challenge to a statute which imposed a stamp tax on oleomargarine. The statute placed the duty upon counties, cities, and towns to ascertain if an applicant for a permit to sell oleomargarine was eligible to purchase such a permit. Once the applicant was found eligible, the permittee was entitled to purchase stamps from the state treasurer to be placed on the oleomargarine, which the permittee would sell. If the permit was issued, the municipality or county issuing the same was required to keep advised at all times as to whether the permittee was complying with the act. If a violation was found, the county or municipality had authority to revoke the permit. An annual license fee of $5 made payable to a county, city, or town for a permit was attacked as a violation of section 5 in that the legislature had imposed a tax to raise revenue for counties, cities, and towns. In finding no violation, this court stated:

> The primary, if not the sole, purpose of issuing the permit and of certifying the revocation of a permit to the state treasurer, is to keep the state treasurer advised as to the persons to whom he may sell stamps. In performing the duties cast upon counties, cities, and towns under the act, they are acting as agencies of the state, and not in the capacity of carrying on local self-government.... We are thus of the opinion that the provision of chapter 91, Laws Utah 1929, whereby an annual fee of $5 shall be paid into the general fund of a county, city, or town for a permit to sell oleomargarine, may well be regarded as compensation for services rendered to the state by the municipality issuing the permit and assisting the state in the enforcement of the act. Under such view, the provision attacked by the respondents is not unconstitutional.

*Id.*, 285 P. at 1004–05.

Finally, in two cases involving the Utah Neighborhood Development Act, again no section 5 violations were found. In *Tribe v. Salt Lake City*, 540 P.2d 499 (Utah 1975), this court declared the problem of urban blight to be one of statewide concern and not merely a local or municipal function. Therefore, under our decision in *Salt Lake County v. Salt Lake City*, we held that the legislature could require the revenue of a municipality to be applied to eradicate urban blight. Four years later, in *Salt Lake County v. Murray City Redevelopment*, 598 P.2d 1339 (Utah 1979), Salt Lake County contended that it would be forced to increase its mill levy to compensate for tax revenues which were diverted to pay redevelopment bonds issued by Murray City Redevelopment and that this constituted a legislative imposition of taxes on Salt Lake County for the purposes of Murray City, contrary to the intent and language of section 5. We held that because improvements benefit the general population of the state, those improvements should be paid for through taxation of the general population and not solely by Murray City. See also *Denver & R.G.R.R. v. Grand County*, 51 Utah 294, 170 P. 74 (1917), and *Baker v. Matheson*, 607 P.2d 233 (Utah 1979), where challenges to legislation based on section 5 were unsuccessful.

■ Turning now to the instant case, plaintiff contends that the assessment and collection of property taxes is a local burden and the essence of local self-government. It points to the fact that in each county there is an elected assessor, auditor, and treasurer who are responsible to the citizens of the county to perform the assessment and collection. Plaintiff particularly decries the transfer of excess revenue raised in certain counties to other counties with a budget shortfall where the revenues may be used to pay the salaries and expenses of taxing officials and their staffs. Defendants respond that section 17–19–15 promotes accurate, equal, and uniform property tax assessment, collection, and distribution, which it asserts to be a state purpose. It would be an oversimplification and wholly inaccurate to adopt the view that because elected county assessors, auditors, treasurers, and their staffs actually perform most of the tasks of assessing,

collecting, and distributing ad valorem taxes in this state, their function is solely a county function which article XIII, section 5 protects. To so hold would ignore other sections of article XIII dealing with revenue and taxation which give the state a vital role and interest in those functions.

Article XIII, section 2(1) provides:

All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed at a *uniform and equal rate* in proportion to its value, to be ascertained as provided by law.

(Emphasis added.) Article XIII, section 3(1) provides:

The Legislature shall provide by law *a uniform and equal rate* of assessment on all tangible property in this state, according to its value in money, except as otherwise provided in Section 2 of this Article. The Legislature shall prescribe by law such provisions as shall secure a *just valuation* for taxation of such property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property . . . .

(Emphasis added.)

To ensure equalization of taxation as mandated by sections 2 and 3 aforesaid, article XIII, section 11 created a state tax commission whose duty it is to administer and supervise the tax laws of the state:

It shall . . . *equalize the valuation and assessment of property among the several counties. . . .* Under such regulations in such cases and within such limitations as the Legislature may prescribe, it shall review proposed bond issues, *revise the tax levies of local governmental units, and equalize the assessment and valuation of property within the counties. . . .*

In each county of this State, there shall be a County Board of Equalization consisting of the Board of County Commissioners of said county. The County Boards of Equalization shall adjust and equalize the valuation and assessment of the real and personal property within their respective counties, *subject to such*

*regulation and control by the State Tax Commission* as may be prescribed by law.

(Emphasis added.) In implementing these constitutional provisions, the legislature in Utah Code Ann. § 59-1-210 has given the tax commission broad power over county taxing authorities, their methods, and their procedures. Briefly, some of those powers are to adopt rules and policies to govern county boards and officers in the performance of any duty relating to assessment, equalization, and collection of taxes. § 59-1-210(3). The commission may prescribe the use of forms relating to the assessment of property and equalization of those assessments, § 59-1-210(4). It may "exercise general supervision over assessors and county boards of equalization, and over other county officers in the performance of their duties relating to the assessment of property and the collection of taxes . . . ." § 59-1-210(7). The tax commission is charged with visiting each county periodically to "investigate and direct the work and methods of local assessors and other officials in the assessment, equalization, and taxation of property, and to ascertain whether the law requiring the assessment of all property not exempt from taxation, and the collection of taxes, have been properly administered and enforced." § 59-1-210(19). Finally, the commission may enforce its supervisory control over the local property tax process by seeking the removal from office of assessors, auditors, members of county boards, and other assessing, taxing, or disbursing authorities who are guilty of official misconduct or neglect of duty. § 59-1-210(12).

These statutory provisions are by no means exhaustive. They do illustrate, however, that the tax commission, under article XIII, has to a large degree assumed control of the local administration of the property tax system. That being so, the legislature by enacting section 17-19-15 has not imposed a tax for the purpose of any county. Rather, a state purpose is served because the tax finances the assessment, collection, and distribution of ad valorem property taxes in each county, ensuring that local

county taxing authorities have sufficient funds to adequately perform their duties, thereby minimizing disparities in the valuation and assessment of properties in violation of article XIII.

Our decision in *Salt Lake County v. Salt Lake City*, discussed previously, gives support to the constitutionality of the statute before us in the instant case. 42 Utah 548, 134 P. 560. In that case, a statute required Salt Lake County to establish a detention home for delinquent children and required Salt Lake City to reimburse the county for the reasonable expense in caring for delinquent children who were residents of the city. We found no violation of article XIII, section 5 since the legislature in enacting the statute had imposed upon the city as an arm of the state some of the state's governmental functions. We pointed out that "such purpose is not one which pertains to the corporate powers or interests of Salt Lake City. This being so, no corporate rights of the city as such are either invaded or disregarded." *Id.*, 134 P. at 564. Similarly, in the instant case, the legislature has required each county to impose a tax which in some instances will produce revenue in excess of that required by that county. The excess revenue is transmitted to the state to be distributed to those counties where the levy does not produce sufficient revenue to finance an adequate assessment program. In so doing, the legislature has not interfered with the right of the county under local self-government to assess and levy taxes for its own purposes. The excess revenue is for the benefit of the state equalization program. To assist the tax commission in carrying out its constitutional duties of equalization, the legislature has chosen to give outside financial support to the taxing authorities in those counties where adequate revenue cannot be produced. That the legislature and the tax commission have chosen to work through county taxing officials to carry out the constitutional mandate of equality and equalization does not detract from the fact that a state purpose is being served thereby. This procedure utilizes the officers of local county government and their staffs to effect state-wide equalization rather than replacing

them with a cadre of state employees to ensure that result.

Cases from other states having constitutional provisions similar or identical to article XIII, section 5 hold that sometimes taxation statutes serve both a local and a state purpose. In 1935, the Colorado Supreme Court decided *In re Hunter's Estate*, 97 Colo. 279, 49 P.2d 1009 (1935). There, the executors of an estate challenged a statute which imposed an additional 10 percent inheritance tax to be used for the payment of old age pensions and the assistance of aged, indigent persons. The court concluded that the challenged statute carried out a state purpose in that a statewide tax was levied for the benefit of state citizens wherever located, according to proportionate needs. The court suggested a test to be used for determining whether a purpose is state or local: "Is it for strictly county uses, for which the county or its inhabitants alone would benefit, or is it for a purpose in which the entire state is concerned or will benefit?" *Id.*, 49 P.2d at 1011. Fifty years later, in *Colorado Department of Social Services v. Board of County Commissioners*, 697 P.2d 1 (Colo. 1985), the court was confronted with a legislative act requiring both the state and the counties to contribute revenues to finance public assistance. After observing the shift in the administration and financing of public assistance from the counties to the state during and following the Great Depression of the 1930s, prompted partly by federal programs such as the Social Security Act of 1935, the court stated that currently there was a strong legislative policy of state control over most aspects of the delivery of public assistance programs in that state. It concluded that the legislation before it served both state and local purposes. Said the court:

> When, as here, the effects of state-wide programs directly benefit residents of special localities, we must conclude that such programs serve the "purposes" of the local governmental units which receive those services *as well as cognizable interests of the state.*

*Id.* at 13 (emphasis added).

It has also been recognized in three Oklahoma cases that taxes imposed by a statute

served both a state and a local purpose. In *Thurston, County Treasurer v. Caldwell*, 40 Okl. 206, 137 P. 683 (1913) the court observed that the state could nevertheless have a sovereign interest in many matters of chiefly local interest. This observation was repeated approvingly in *General Motors Acceptance Corp. v. Hulbert*, 190 Okl. 568, 125 P.2d 975 (1942), and in *Board of Commissioners of Marshall County v. Shaw*, 199 Okl. 66, 182 P.2d 507 (1947).

## IV. REVENUE SHARING

■ Plaintiff further contends that the statute mandates impermissible horizontal revenue sharing in violation of the second sentence of article XIII, section 5, which provides:

> Notwithstanding anything to the contrary contained in this Constitution, political subdivisions may share their taxes and other revenues with other political subdivisions as provided by statute.

Plaintiffs argue that this constitutional provision is violated because revenues generated by taxes imposed on property in one county are diverted to the state treasurer for redistribution to other counties. The trial court held that the redistribution is permissible under *Tribe v. Salt Lake City*, 540 P.2d 499 (Utah 1975), and *Salt Lake County v. Murray Redevelopment*, 598 P.2d 1339 (Utah 1979), wherein this court upheld the diversion of county tax revenues to a redevelopment agency for the purpose of alleviating the statewide problem of blight. The trial court further ruled that defendant Garfield County Commission, by proposing and adopting a budget pursuant to the statute, voluntarily agreed to any revenue sharing that there may be. We find no error. The last sentence of section 5 does not prohibit the diversion of revenues raised in a county to effect a statewide purpose. The sentence simply allows voluntary revenue sharing between local governments when local purposes rather than state purposes exist. We do not view the amendment as prohibiting the state from creating a funding mechanism when a statewide purpose is involved.

## V. SUMMARY JUDGMENT

■ Finally, Mountain States contends that summary judgment was improper because its due process, equal protection, and taking of private property claims of as-applied unconstitutionality required further discovery and factual analysis. Summary judgment is granted when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *B & A Assocs. v. L.A. Young Sons Constr.*, 796 P.2d 692, 694 (Utah 1990); *Utah State Coalition of Senior Citizens v. Utah Power & Light Co.*, 776 P.2d 632, 634 (Utah 1989); Utah R.Civ.P. 56(c). In reviewing a grant of summary judgment, we view the facts in a light most favorable to the losing party. *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 636 (Utah 1989). In deciding whether the trial court properly granted judgment as a matter of law to the prevailing party, we give no deference to the trial court's view of the law; we review it for correctness. *Utah State Coalition*, 776 P.2d at 634; *Ron Case Roofing and Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1384–85 (Utah 1989).

Mountain States contends that it has been denied equal protection under the federal constitution as well as under article I, section 24 of the Utah Constitution, which commands, "All laws of a general nature shall have uniform operation." *See also* U.S. Const. amend. XIV, § 1. Mountain States argues that these provisions restrain legislatures from the "fundamentally unfair practice of creating classifications that result in different treatment being given persons who are, in fact, similarly situated, all of which redounds to the detriment of some of those so classified." *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888 (Utah 1988). We fail to see the relevance of this generalized claim. The purpose of the levy was to create uniformity in the assessment of property. It is a statewide levy based on property valuation. No particular class of taxpayer, such as insurance brokers, utilities, or hotels, has been arbitrarily classified to bear the burden of the levy. *See, e.g., Blue Cross & Blue Shield v. State*, 779 P.2d 634;

*Mountain Fuel Supply Co.,* 752 P.2d 884; *Little America Hotel Corp. v. Salt Lake City Corp.,* 785 P.2d 1106 (Utah 1989).

Mountain States' due process claim relies upon statements made in two commerce clause cases that a "reasonable relationship" is needed between the tax rate and the taxed activity. These cases, *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 626–27, 101 S.Ct. 2946, 2958, 69 L.Ed.2d 884, 900–01 (1981), and *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 436, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510, 520 (1980), reiterate federal precedent that a reasonable relationship or proportionality test is one of the requirements imposed by the due process clause for a state to tax income generated in interstate commerce. No authorities were cited to establish this test as relevant to the instant case. Our precedents clearly establish that a tax is not an assessment of benefits and no "reasonable relationship" test need be met to justify the imposition of the tax. *Little America Hotel Corp.,* 785 P.2d at 1108; *Menlove v. Salt Lake County,* 18 Utah 2d 203, 418 P.2d 227, 229 (1966).

Also, Mountain States' challenge to the statute that it impermissibly results in a taking of private property for public use without compensation was properly disposed of by the summary judgment. Relying on *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), Mountain States asserted that the statute required it to bear a public burden which in fairness and justice should be borne by the public as a whole. Again, we fail to see any merit to that argument since the statute imposes a statewide levy upon all real property in the state and all owners pay taxes based on the valuation of their property. No one property owner is singled out and a greater burden imposed.

The trial court did not abuse its discretion in refusing to permit Mountain States additional time to conduct discovery before ruling on Garfield County's motion for summary judgment. Mountain States argues that it wanted to discover whether any revenue raised by the tax was used to pay expenses of counties and county officials in the performance of their official duties, which, it argues, would be using the revenue for county purposes. What we have said in part III of this opinion answers this argument. Since a state purpose, and not a county purpose alone, is being financed by the revenue, it is of no consequence that the revenue pays for county officials and employees engaged in the assessment, collection, and distribution of taxes.

Affirmed.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.